[No. S087484. Aug. 23, 2001.]

LACHI DELISA RICHARDS, Plaintiff and Respondent, v.
CH2M HILL, INC., Defendant and Appellant.

## COUNSEL

Seyfarth, Shaw, Fairweather & Geraldson, Seyfarth Shaw, Mark H. Van Brussel, Mark P. Grajski; Sherman & Howard and Theodore A. Olsen for Defendant and Appellant.

Paul, Hastings, Janofsky & Walker, Katherine C. Huibonhoa and Paul W. Cane, Jr., for California Employment Law Council as Amicus Curiae on behalf of Defendant and Appellant.

Gibson, Dunn & Crutcher, David A. Cathcart, Timothy S. Lykowski and Annette M. Gammon for The Employers Group as Amicus Curiae on behalf of Defendant and Appellant.

Christopher H. Whelan; Joseph Posner; Law Offices of Ellen Lake and Ellen Lake for Plaintiff and Respondent.

## OPINION

**WERDEGAR, J.**—Plaintiff, a disabled employee, resigned from her job after a five-year period during which she claimed her employer was unwilling to effectively accommodate her disability. She sued her employer for disability discrimination and harassment, and the jury found in her favor, awarding substantial sums as damages to compensate for severe emotional distress and lost salary. Many of the incidents of disability discrimination

introduced at trial occurred outside the one-year limitations period for filing Fair Employment and Housing Act actions. (Gov. Code, § 12960.)[1]

This case raises the following question of interpretation of the Fair Employment and Housing Act (the FEHA; § 12900 et seq.): May an employer be held liable for unlawful actions occurring outside the limitations period? In addressing this question, we must determine the scope of the "continuing violation doctrine." That doctrine, described at greater length below, allows liability for unlawful employer conduct occurring outside the statute of limitations if it is sufficiently connected to unlawful conduct within the limitations period. We conclude, consistent with the language and purposes of the FEHA, as well as federal and California case law, that an employer's series of unlawful actions in a case of failure to reasonably accommodate an employee's disability, or disability harassment, should be viewed as a single, actionable course of conduct if (1) the actions are sufficiently similar in kind; (2) they occur with sufficient frequency; and (3) they have not acquired a degree of "permanence" so that employees are on notice that further efforts at informal conciliation with the employer to obtain accommodation or end harassment would be futile. We will accordingly reverse the judgment of the Court of Appeal and direct it to remand the cause to the trial court for application of this three-pronged test.

## I. STATEMENT OF FACTS[2]

Plaintiff Lachi Delisa Richards was hired by CH2M Hill, Inc., a nationwide engineering firm, as a civil engineer and began work in 1984 in the water resources division at its Redding office. By all accounts, Richards was an outstanding engineer, who consistently generated favorable performance evaluations and continued, even during the period of her illness discussed below, to be a dedicated employee.

In late 1987, Richards began experiencing tremors and difficulty walking. Although she could still walk, she began using a wheelchair in April 1988 as a means of conserving energy. In October 1988, Richards was diagnosed with multiple sclerosis (MS).[3] Richards's supervisors initially agreed to her request that she be given a part-time schedule, that she not be required to

---

[1]All statutory references are to the Government Code unless otherwise specified.

[2]These facts are taken largely from the Court of Appeal opinion. Since the issue before us, at least in part, is whether there was sufficient evidence for the trial court to have concluded that Richards's claims were timely, the facts are set forth in the light most favorable to her, unless specified otherwise. (*Nestle v. City of Santa Monica* (1972) 6 Cal.3d 920, 925 [101 Cal.Rptr. 568, 496 P.2d 480].)

[3]MS is a slowly *progressive*, debilitating disease of the central nervous system. (Merck Manual (17th ed. 1999) p. 1474.) "The disease is characterized by various symptoms and

perform any fieldwork, and that she be permitted to work out of the Sacramento office. Dr. Swank, Richards's treating physician and an international expert on MS, testified that MS is a fluctuating disease in which a patient's symptoms may come and go, depending in large part on the level of stress and exertion that the patient sustains.

Richards's symptoms continued to worsen. On her doctor's advice, Richards took an indefinite leave of absence, which ultimately lasted 10 months, beginning in March 1989.

On January 2, 1990, Richards returned to work in the Sacramento office. As her condition improved, she eventually worked an average of 20 to 25 hours per week. She performed some of her work at the office and some of her work at home—a routine that continued until February 1993, when she tendered her resignation.

Both before and after Richards was diagnosed with MS, a number of issues arose regarding CH2M Hill's accommodation of her disability. We summarize these issues below.

A. *Richards's Transfer*

When Richards began her 10-month leave of absence in March 1989, she requested a formal transfer from the Redding office to the Sacramento office, both because it offered her closer proximity to her doctors, and because the Redding office was not wheelchair-accessible. Although the transfer approval process normally takes 60 to 75 days, approval of Richards's transfer took 11 months. It was not approved by the regional district manager, Robert Harding, until February 1990—one month after Richards's return from her leave of absence. Nonetheless, Richards reported to work at the Sacramento office when she returned from her leave on January 2, 1990—and in fact, had been working there prior to her leave of absence.

The evidence suggested the approval of Richards's transfer was delayed primarily because Harding believed Richards had lied on her employment application about her medical condition, despite the lack of evidence of such misrepresentation. He was not inclined to accommodate an employee whose candor he questioned, a viewpoint he unhesitatingly expressed to some of the supervisors in the Redding and Sacramento offices. In 1990, Mike Kashiwagi, the civil engineering department manager, told Richards that despite her good work, Harding and those in the corporate office wanted her to resign.

signs of [central nervous system] dysfunction, with remissions and recurring exacerbations." (*Ibid.*)

## B.  *Computer Issues*

During her 10-month leave of absence, Richards undertook to teach herself a new computer software program. To assist Richards in this endeavor, Grant Davids, Richards's Sacramento office supervisor, would bring a company computer to her home on weekends. In August 1989, Richards asked Davids if the company would lend her a computer to keep at home following her return to work. Davids informed her that CH2M Hill was not likely to lend her a computer and encouraged her to buy her own. He did, however, give his approval to Richards to work at home part time following her return from her leave of absence. Richards proceeded to contact the California Department of Rehabilitation and several private organizations, seeking funding to purchase a computer. When two private organizations distributed flyers asking for contributions in Richards's name and identifying CH2M Hill as her employer, Richards's other supervisors told her that the solicitations had embarrassed the company. Richards was requested to ask the private organizations to withdraw the solicitations.

In November 1989, at the urging of one of CH2M Hill's managers, Richards met with Stan Smith, the Redding regional manager, to seek authorization to perform computer work at her home and to ask that CH2M Hill provide her with a computer. Smith told Richards that while the company was not asking her to resign, it was having difficulty comprehending how it could accommodate her disability. By the end of the meeting, Smith told Richards that the Sacramento office would have to make the decision on the computer. In fact, Richards never received an answer. As a result, in December 1989—while still on leave—Richards informed CH2M Hill it no longer needed to provide her with a computer because she had secured funding assistance from the Department of Rehabilitation. Richards then purchased her own computer.

During the August to December 1989 period in which she was seeking a computer, Richards sought legal advice from a lawyer and a private organization that advocates for the disabled, Resources for Independent Living, in an effort to determine whether her computer request was "reasonable," as well as to determine her rights in general to "reasonable accommodation" under the law. They advised her that her request was reasonable and provided additional information regarding the reasonable accommodation of her disability.

## C.  *The Cot*

In November 1988, while she was already working out of the Sacramento office, Richards, acting on her doctor's advice, asked Carol Uhouse, the

regional administrative manager responsible for facilities in the Sacramento office, to purchase a bed so that she could rest during her breaks and at lunchtime.

Instead of purchasing a bed, the company purchased a folding army cot. Uhouse insisted that Richards help pay for items such as a mattress and sheets, while the company paid for blankets and a pillow.

Uhouse vetoed Richards's request that the cot be placed in any of several vacant offices, believing that the cot would be visible to, and look unprofessional to, clients and other visitors. Uhouse suggested that the cot be placed in an unheated and uncooled storage area known as the "black hole." Richards vetoed that suggestion.

Following Richards's return from her leave of absence in January 1990, the cot was set up in a drafting room next to Richards's office. However, Uhouse would periodically move the cot without notice when the space was needed for other purposes. This scenario continued until the spring or summer of 1990, when Richards's department manager, Loren Bottorff, moved the cot to a vacant office next to a new office into which Richards had recently moved. Richards considered the new location unsatisfactory, primarily because the room had a pole in the middle that prevented her from closing the door if her wheelchair was in the room, although Bottorff testified Richards had made no complaint to him about the cot's new location. In any case, from that point forward, Richards dropped the cot issue and would go home whenever she needed to rest.

### D. *Location of Richards's Office*

Upon Richards's return from her leave of absence, Uhouse led Richards past her old office—which remained intact, with all of her personal belongings still inside—to the back of a "storage/layout kind of all-purpose junk room area" where there was nothing but a rug, and pointed to the area, stating, "This is your office." One of the engineers was asked to put a desk together for Richards; Richards "found" a telephone; and various coworkers and friends assisted Richards in furnishing and arranging her storage room office. Two days later, Richards returned to her old office. Another employee had moved into it. All of her personal items were gone. It took several weeks for her to regain her property. Even then, some of the items, such as design manuals and books, were missing.

According to Richards, Davids remarked that Uhouse put Richards's office in the "storage area" because Uhouse thought Richards "was milking

the company and milking people because [Richards] had MS; that [Richards] was trying to get sympathy from people by asking for the computer; . . . [and that Uhouse] felt that the company was bending over backwards to let [Richards] in the door, and . . . was not going to do another thing for [Richards]." Davids suggested that Richards meet with Uhouse in an effort to improve their relationship. In the summer of 1990, after about six months in the storage area office, Richards was permitted to move into a new office in the water resources area of the building.

### E.  Richards's Meeting in January 1990 to Request Reasonable Accommodation

In January 1990, Richards prepared a document which discussed why she wanted her own computer and which requested "accommodations in the area of a flexible time schedule" and permission "to work partially at home."

Richards then met with Uhouse and Steve DeCou, the Sacramento office manager. DeCou and Uhouse rejected Richards's request that she be allowed to work part time at home. Despite the lack of permission, Richards did in fact begin working part time at home, and in October or November of 1990, Bottorff gave Richards permission to do so without seeking authorization from Uhouse.

### F.  Access Issues

#### 1.  Office Doors

Shortly after Richards returned from her leave in January 1990, she told Uhouse that some of the doors in the building were hard to open and asked that they be adjusted. Uhouse said that she would take care of the problem. She did not. The following month, February 1990, Richards took care of the problem with the assistance of her boyfriend and other friends.

#### 2.  Gary Dobson's Furniture and Equipment

From January to June 1990, Richards had a problem maneuvering her wheelchair into her office because of furniture and equipment kept in the hallway by Gary Dobson, the surveying department manager. Richards requested Dobson to move the offending items. He refused. Whenever Richards moved the items herself, Dobson would move them back. The problem continued until June 1990, when Richards was relocated to her new office in the water resources area.

### 3. Richards's October 1990 Memo to Uhouse Concerning Access

On October 3, 1990, Richards wrote a memo to Uhouse, complaining about various impediments to access within the office.

#### a. The Reception Area Door

Richards accessed CH2M Hill's offices through a particular reception area door. In September 1990, Uhouse decided to keep it closed because the receptionist claimed that she could not do her job over the noise of a nearby mailroom.

Richards's October 1990 memo requested that the door be kept open during her work hours. It appears from that point forward, the door was kept open during the hours she was most likely to be at work and was otherwise closed. The issue was never raised again.

#### b. The Wheelchair Ramp

Beginning with her use of a wheelchair in April 1988, Richards had a problem traversing the wheelchair ramp leading to CH2M Hill's offices. Whenever it rained, the lawns were watered, or the water fountain at the top of the ramp overflowed, the ramp would become slippery, causing Richards's manual wheelchair to hydroplane. On such occasions, she needed to muscle her way up or get a "running start."

In her October 1990 memo to Uhouse, Richards suggested that nonskid tape be applied to the ramp, which she estimated would have cost approximately $30. In the alternative, she suggested that drainage grooves be cut into the ramp. In October or November 1990, the building handyman applied a substance to the ramp in an effort to improve traction, but the repair was ineffectual. Richards continued to raise the issue with Uhouse, but the ramp was never modified to Richards's satisfaction. In January or February 1991, however, Richards began using a power wheelchair, which was unaffected by wet conditions on the ramp.

#### c. The Building Elevator

In her October 1990 memo to Uhouse, Richards complained that "[t]he wheels of the wheelchair catch on the lip of the elevator floor[,] which slows [her] entrance into the elevator [such] that the doors close on [her] arms." Despite Richards's request that the elevator doors be fitted with an electronic eye, or that the time be lengthened for the doors to remain open, the problem was never fixed.

### d. *The Lunchroom*

In her October 1990 memo, Richards complained that "[t]he vending machines and southern counter area in the lunch room are not useable without my rearranging the tables and chairs each day."

In December 1991, another problem arose: The vending machines blocked Richards's access to the microwave, which had been moved to the back of the lunchroom and which she needed to warm up a special lunch prescribed by her physician.

In response to Richards's complaints, Uhouse moved one of the vending machines into a nearby hallway in order to give her access to the back of the room, including the microwave. However, the subsequent addition of recycling bins once again prevented her from accessing the microwave oven. Richards testified that her fellow employees would help her with the microwave.

### e. *Library Access*

When Richards first started using a wheelchair in April 1988, she could access the entire Sacramento office library, except for two stacks that were too close together. In 1990, a microfiche machine was added, cutting off wheelchair access to all of the stacks. Richards mentioned the problem in her October 1990 memo. However, in mid-1992, the library was relocated, and access was no longer a problem for Richards.

### f. *Supply Room Access*

Richards's October 1990 memo noted that it was difficult for her to access the supply room because of the placement of big paper cases in the aisles. The problem continued for several months, until the supply room was moved to a different location. However, the new location was effectively inaccessible because it required Richards to negotiate two 90-degree turns in her wheelchair. Sometime in 1991, Richards requested that the supply room be rearranged, giving her access to those supplies that she needed on a frequent basis. Her suggestion was never acted upon.

### g. *Hallway Access*

Richards also complained in her October 1990 memo that boxes, furniture, and equipment in the hallways made wheelchair access difficult. In some areas, Richards would scrape her elbows against boxes piled up along the

corridor, causing them to fall on her. In other areas, it was difficult, if not impossible, for Richards to turn her wheelchair around. Richards asked that the hallways have at least 36 inches of clearance space, and that corners have at least 45 inches of clearance. Access to an upstairs hallway, which was also impeded, was particularly important to Richards because she needed access to the word processing, drafting and computer services there "every day that [she] was at work." No changes were made until 1993.

### G.  *Assignment to Strenuous Field Work*

Sometime in mid-1990, Norm Brazelton, a top CH2M Hill manager, asked Richards to take a field assignment that would have required her to do a great deal of walking along canal banks and climbing over barbed wire fences. At the time Brazelton discussed the matter with Richards, she was in her wheelchair and it was obvious she would be unable to do the assignment. Concerned she was being set up to fail, Richards, through her supervisor, proposed alternative ways to participate in the project. Brazelton did not pursue the idea but refused to speak to her for several months.

### H.  *Events of 1992*

Richards thereafter missed work for a month following a car accident in February 1992, and took two weeks off in June 1992 to get married. After Richards returned in July 1992, her symptoms worsened to the point where she was unable to walk, to move her fingers or hold a pencil, or even to raise her left arm off her lap.

Using her vacation time and sick leave, Richards took off from work between August 1 and November 18, 1992. When she returned, she worked a schedule varying from nine to 20 hours per week.

### I.  *Events Within the Limitations Period*

On or around January 27, 1993, Richards and the department manager, Bottorff, met for her annual evaluation. At the meeting, Richards submitted typewritten comments, which raised several items: Richards had been unable for the past three years to get a timely and correct W-2 form; her wheelchair access in the hallways was restricted due to the constant accumulation of furniture and boxes; the disabled access ramps were often blocked by delivery trucks; and CH2M Hill had not yet established an adequate fire escape plan for Richards. According to Richards, Bottorff told her that she was facing a brick wall and that nothing was going to change, as she had been told the previous year.

That same day, Bottorff gave Richards's typewritten comments to human resources administrator Kathy Metzger. Metzger began in earnest to attempt to address Richards's concerns. Between January 27 and February 8, 1993, Metzger reported to Richards almost daily on the progress made on her complaints. Metzger made sure the caterer and postal service were contacted and directed not to block the ramps. She formed a committee to develop a fire escape plan for Richards, and contacted the building owner to see if an additional wheelchair ramp could be built outside the exit near Richards's office. She had moved several of the items that were obstacles to Richards's access, including bookcases and furniture. Finally, Metzger began contacting various people in the corporate office and elsewhere in an effort to resolve the problems associated with Richards's W-2 form.

Not all of Richards's access problems were resolved, however. Metzger had moved the microwave to an accessible area, but "someone began piling ice chests in front of it" and she lost access again. Metzger's attempts to move certain bookcases that blocked hallway access foundered when Uhouse informed her she did not have the staff to accomplish the task.

When Richards returned to work on February 22, 1993, she submitted her resignation effective March 8, 1993. Richards testified that she resigned because she believed that all of the events over the previous four years had had a negative impact on her health: "the accumulation of just so many things, it was just—it was unbearable for me. I could not work there any longer." Richards continued: "I knew my health was on the line. I was risking my health, permanent damage to my health."

### J.  The Institution of Richards's Claims

Richards filed her administrative complaint with the California Department of Fair Employment and Housing (the Department) on January 25, 1994. Richards elected to proceed with a civil action, and the Department issued Richards a right-to-sue letter.

Richards then filed this civil action against CH2M Hill. When trial began, Richards's claims were (1) disability harassment under the FEHA, (2) disability discrimination under the FEHA, (3) constructive discharge in violation of public policy, and (4) intentional and negligent infliction of emotional distress.

Before trial, CH2M Hill moved in limine to exclude evidence of unlawful conduct against Richards that occurred before the limitations period of January 25, 1993. The company also moved to preclude Richards from

introducing evidence of purported past or future wage loss. The trial court denied the motions.

A six-week jury trial commenced on June 2, 1997. Late in the trial, Richards dismissed her constructive discharge in violation of public policy claim and her claims for intentional and negligent infliction of emotional distress. Based on the trial court's ruling that CH2M Hill's conduct constituted a continuing violation, Richards was permitted to introduce evidence of, and seek damages for, the entire five-year period (1988-1993) of alleged harassment and discrimination.

Finding CH2M Hill had discriminated against Richards, both in creating a hostile work environment and in failing to reasonably accommodate her disability, the jury awarded her $925,000 in emotional distress damages and $476,000 in economic damages.

CH2M Hill moved for judgment notwithstanding the verdict and for a new trial, based in part on the claim that much of the conduct for which it was found liable occurred outside the limitations period. The trial court denied the motion, finding that all the evidence of misconduct introduced at trial was part of "a course of conduct. I think you can't look at a hostile work environment without looking at what the environment really was and how it existed. And this one happened to exist over a period of time and over a period of years involving the same problems." CH2M Hill timely appealed.

The Court of Appeal reversed. It held that the trial court had misapplied the continuing violation doctrine and had improperly allowed the jury to award damages to Richards for injuries occurring outside the limitations period. The court concluded that the statute of limitations is tolled only up to the point at which Richards knew or should have known that her rights were being violated, and under that test, all of the employer conduct occurring outside the limitations period was time-barred. It further concluded that some unlawful conduct had occurred during the limitations period and remanded the case to the trial court for a redetermination of damages, limited to incidents occurring within this period.

## II. Discussion

### A. *Statute of Limitations and the Continuing Violation Doctrine*

The statute of limitations for FEHA actions states, in pertinent part: "No complaint may be filed after the expiration of one year from the date upon which the alleged unlawful practice or refusal to cooperate occurred, except

that this period may be extended as follows: (a) for not to exceed 90 days following the expiration of that year, if a person allegedly aggrieved by an unlawful practice first obtained knowledge of the facts of the alleged unlawful practice after the expiration of one year from the date of their occurrence, or (b) for not to exceed one year following a rebutted presumption of the identity of the person's employer under Section 12928, in order to allow a person allegedly aggrieved by an unlawful practice to make a substitute identification of the actual employer." (§ 12960.)

The Court of Appeal correctly concluded that some of CH2M Hill's misconduct was within the relevant limitations period for FEHA actions— e.g., the persistent blocking of hallway access and access to the supply room, the failure to prepare a fire escape plan, the failure to adjust the timing of the elevator door to provide access to the lunchroom. Other misconduct occurred outside the limitations period. Richards argues that these actions were nonetheless properly presented to the jury, both for evidentiary purposes and for purposes of proving damages, because they were brought in by the continuing violation doctrine. The Court of Appeal held, and CH2M Hill argues, that only those incidents of failure to reasonably accommodate that occurred within the limitations period were properly placed before the jury. To decide which party is correct, we must determine the proper scope of the continuing violation doctrine.

■ Essentially, the continuing violation doctrine comes into play when an employee raises a claim based on conduct that occurred in part outside the limitations period. In such cases, two questions are potentially raised. The first question is evidentiary: Are the alleged acts outside the limitations period admissible as relevant background evidence? (See *United Airlines, Inc. v. Evans* (1977) 431 U.S. 553, 558 [97 S.Ct. 1885, 1889, 52 L.Ed.2d 571].) The second and more difficult question is remedial: Is an employer liable for actions that take place outside the limitations period if these actions are sufficiently linked to unlawful conduct within the limitations period? It is this second question that is at issue in this case.

1. *Review of Case Law*

■ " 'Because the antidiscrimination objectives and relevant wording of title VII of the Civil Rights Act of 1964 (Title VII) [(42 U.S.C. § 2000e et seq.)] [and other federal antidiscrimination statutes] are similar to those of the FEHA, California courts often look to federal decisions interpreting these statutes for assistance in interpreting the FEHA.' " (*Reno v. Baird* (1998) 18 Cal.4th 640, 647 [76 Cal.Rptr.2d 499, 957 P.2d 1333].) A review of federal case law regarding the continuing violation doctrine reveals the

doctrine to be, as one leading treatise has noted, "arguably the most muddled area in all of employment discrimination law." (2 Lindemann & Grossman, Employment Discrimination Law (3d ed. 1996) p. 1351.) This is so because the doctrine refers not to a single theory, but to a number of different approaches, in different contexts and using a variety of formulations, to extending the statute of limitations in employment discrimination cases. Our review of federal case law reveals essentially four approaches to the continuing violation doctrine.

In the first approach, a continuing violation is found when a corporate policy is initiated before the limitations period but continues in effect within that period to the detriment of the employee. As the Ninth Circuit Court of Appeals stated in *Williams v. Owens-Illinois, Inc.* (9th Cir. 1982) 665 F.2d 918, 924: "[A] systematic policy of discrimination is actionable even if some or all of the events evidencing its inception occurred prior to the limitations period. [Citation.] The reason is that the continuing system of discrimination operates against the employee and violates his or her rights up to a point in time that falls within the applicable limitations period." For example, a discriminatory promotions policy implemented long before a lawsuit is brought is actionable if it continues into the limitations period to wrongfully deny an employee a promotion. (*Ibid.*; see also *E.E.O.C. v. Local 350, Plumbers and Pipefitters* (9th Cir. 1992) 982 F.2d 1305, 1308 [policy of discriminating against retirees in hiring hall]; *Abrams v. Baylor College of Medicine* (5th Cir. 1986) 805 F.2d 528, 533-534 [policy of discrimination against Jews in staffing Saudi Arabian hospital]; *Bartmess v. Drewrys U.S.A., Inc.* (7th Cir. 1971) 444 F.2d 1186, 1188 [compulsory retirement policy discriminating against women].) Two cases from our own Courts of Appeal also have concluded that a policy of systematic discrimination in the area of promotions constitutes a continuing violation. (*Valdez v. City of Los Angeles* (1991) 231 Cal.App.3d 1043, 1052-1054 [282 Cal.Rptr. 726]; *City and County of San Francisco v. Fair Employment & Housing Com.* (1987) 191 Cal.App.3d 976, 983 [236 Cal.Rptr. 716].)

A second approach to the continuing violation doctrine is derived from the doctrine of equitable tolling. This approach has been cogently expressed by Judge Posner in *Moskowitz v. Trustees of Purdue University* (7th Cir. 1993) 5 F.3d 279: "Under the doctrine of equitable tolling, . . . a person injured by an unlawful act need not sue until he knows, or through the exercise of reasonable diligence would have known, not only that he has been injured (for once he discovers that, his cause of action has accrued and the statute of limitations begins to run) but also that he has been injured by a possibly wrongful act of the [employer] . . . . If it is only with the benefit of hindsight, after a series of discriminatory acts, that the [employee] can

realize that he is indeed a victim of unlawful discrimination, he can sue in regard to all of the acts provided he sues promptly after learning their character, even if the statute of limitations has run on all of them. If, however, he knows or with the exercise of reasonable diligence would have known after each act that it was discriminatory and had harmed him, he may not sit back and accumulate all the discriminatory acts and sue on all within the statutory period applicable to the last one. So the fact that a series of discriminatory or otherwise unlawful acts is indeed a series, a continuum, rather than a concatenation of unrelated acts, will delay the deadline for suing with respect to the earliest acts in the series *only if* their character was not apparent when they were committed but became so when viewed in the light of the later acts." (*Id.* at pp. 281-282, italics added.) The *Moskowitz* court viewed equitable tolling as the sole basis of the continuing violation doctrine. (*Id.* at p. 282.) The Court of Appeal in the present case appears to have adopted a similar view.

A third approach is the multifactored test first articulated in *Berry v. Board of Sup'rs of L.S.U.* (5th Cir. 1983) 715 F.2d 971 (*Berry*). Under this approach, equitable tolling is one of a number of considerations for determining when a violation is deemed to be continuing. The court formulated the three nonexclusive factors of its test as follows: "The first is subject matter. Do the alleged acts involve the same type of discrimination, tending to connect them in a continuing violation? The second is frequency. Are the alleged acts recurring (e.g., a biweekly paycheck) or more in the nature of an isolated work assignment or employment decision? The third factor, perhaps of most importance, is degree of permanence. Does the act have the degree of permanence which should trigger an employee's awareness of and duty to assert his or her rights, or which should indicate to the employee that the continued existence of the adverse consequences of the act is to be expected without being dependent on a continuing intent to discriminate? . . ." (*Id.* at p. 981.) This third factor is akin to equitable tolling, focusing on when the employee was put on notice that his or her rights had been violated.

The *Berry* test has been widely adopted by the federal courts. (See *Bullington v. United Air Lines, Inc.* (10th Cir. 1999) 186 F.3d 1301, 1311; *Filipovic v. K & R Exp. System Inc.* (7th Cir. 1999) 176 F.3d 390, 396; *Sabree v. United Broth. of Carpenters and Joiners* (1st Cir. 1990) 921 F.2d 396, 402; *Hendrix v. City of Yazoo City, Miss.* (5th Cir. 1990) 911 F.2d 1102, 1104; *Roberts v. Gadsen Memorial Hosp.* (11th Cir. 1988) 835 F.2d 793.) Although a number of courts using the *Berry* test have emphasized the paramount importance of the third factor, i.e., the permanence of the action (see, e.g., *Selan v. Kiley* (7th Cir. 1992) 969 F.2d 560, 565-566, and cases cited therein; *Bullington v. United Air Lines, Inc., supra*, 186 F.3d at p. 1311), a review of

the cases reveals that the weight and significance given to this factor is highly variable, often depending on the context in which the continuing violation doctrine is being applied.

For example, some courts employing the *Berry* test in the context of sexual or racial harassment have concluded that such harassment often lacks the "permanence" to start the running of the statute of limitations. As one court stated: "Acts of harassment that create an offensive or hostile environment generally do not have the same degree of permanence as, for example, the loss of promotion. If the person harassing [an employee] leaves his job, the harassment ends; the harassment is dependent on a continuing intent to harass. In contrast, when a person who denies [an employee] a promotion leaves, the [employee] is still without a promotion even though there is no longer any intent to discriminate. In this latter example, there is an element of permanence to the discriminatory action, which should, in most cases, alert [an employee] that her rights have been violated." (*Waltman v. International Paper Co.* (5th Cir. 1989) 875 F.2d 468, 476.)

Some courts applying the *Berry* test have found, moreover, a continuing violation based on a pattern of harassment even when the harassment is of such a serious nature as plainly to place the employee on notice that her rights were being violated. For example, in *Martin v. Nanny and the Newborns, Inc.* (10th Cir. 1993) 3 F.3d 1410, the court was confronted with a pattern of hostile environment sexual harassment that met the first two factors of the *Berry* test: the acts of harassment were sufficiently related and occurred with great frequency. But the facts relevant to the third factor were not in the employee's behalf—she had been allegedly raped outside of the limitations period, an event that clearly would have put her on notice that her rights had been violated. Nonetheless, the court found the first two factors weighed sufficiently on her behalf to overcome this deficiency and avoid summary judgment on statute of limitations grounds. (*Martin, supra,* 3 F.3d at pp. 1415-1416; see *Bullington v. United Airlines, Inc., supra,* 186 F.3d at p. 1311, fn. 4 [*Berry* test not a bright-line test, and weight given to the factors varies according to the facts].)

Similarly, in the area of reasonable accommodation for disability, some courts applying the *Berry* test have found a continuing violation based primarily on the factors of similarity of subject matter and frequency of misconduct, deemphasizing the permanence factor. In *Lewis v. Board of Trustees of Alabama State University* (M.D.Ala. 1995) 874 F.Supp. 1299, 1304, an employee had made repeated requests, repeatedly refused, for a transfer to accommodate her disability. The question presented was whether the statute of limitations began to run from the first refusal, as the employer

contended, or from the last. Using the *Berry* test adopted by the Eleventh Circuit Court of Appeals in *Roberts v. Gadsen Memorial Hosp.*, *supra*, 835 F.2d 793, the court concluded that the complaint contained sufficient allegations of an ongoing practice of discrimination for failure to reasonably accommodate the employee's disability to survive the motion to dismiss. The court did not consider the permanence factor, but only that the various acts were nearly identical and were frequent enough to be properly viewed as a continuing violation. (*Ibid.*; see also *Bodiford v. State of Alabama* (M.D.Ala. 1994) 854 F.Supp. 886, 890-891 [repeated denials of request for a transfer on the basis of disability a continuing violation], disapproved on other grounds in *Holbrook v. City of Alpharetta, Ga.* (11th Cir. 1997) 112 F.3d 1522, 1530-1531.)

A fourth approach to the continuing violation doctrine has dispensed with the permanence factor altogether. This approach is exemplified by the Ninth Circuit Court of Appeals, which has adopted what may be termed a "course of conduct" test rather than the *Berry* test, as was recognized in *Counts v. Reno* (D.Hawaii 1996) 949 F.Supp. 1478, 1484-1486. The test employed is essentially whether the separate acts of discrimination are " 'closely enough related' " to form a continuing violation. (*Id.* at p. 1485; see also *Fielder v. UAL Corp.* (9th Cir. 2000) 218 F.3d 973, 987-988 [rejecting *Berry* test with regard to hostile environment claims]; *Anderson v. Reno* (9th Cir. 1999) 190 F.3d 930, 936-937 [pattern of sexual harassment found to be sufficiently related]; *Draper v. Couer Rochester, Inc.* (9th Cir. 1998) 147 F.3d 1104, 1108 [same]; *Sosa v. Hiraoka* (9th Cir. 1990) 920 F.2d 1451, 1457 [various discriminatory actions against an instructor were "reasonably related" and therefore a continuing violation]; *Green v. Los Angeles Cty. Superintendent of Sch.* (9th Cir. 1989) 883 F.2d 1472, 1480-1481 [series of discriminatory acts may constitute continuing violation].) A continuing violation will not be found, on the other hand, when the alleged misconduct involves different types of unlawful discrimination. (See *Green, supra*, 883 F.2d at p. 1481 [no continuing violation where pre-limitations-period misconduct involved co-worker harassment and post-limitations-period conduct involved employer's official discriminatory acts]; see also *Huckabay v. Moore* (5th Cir. 1998) 142 F.3d 233, 239-240 [continuing racial harassment was an ongoing violation but demotion and failure to promote were not].)

Our own Court of Appeal adopted a broad view of the continuing violation doctrine akin to that embraced by the Ninth Circuit in *Accardi v. Superior Court* (1993) 17 Cal.App.4th 341 [21 Cal.Rptr.2d 292]. In that case a female police officer sued her employer under the FEHA, alleging that in her 11 years with the department she was subjected to various forms of sexual harassment, including having untrue rumors spread about her abilities, being singled out for unfavorable work assignments, and being subjected to various sexist remarks and sexual advances. The only incidents that

occurred during the limitations period were an allegedly mishandled workers' compensation and disability claim and a failure to reassign her to work details assigned to other partially disabled officers. Her employer argued that these alleged later forms of discrimination differed from the earlier forms of sexual harassment and that therefore the earlier forms were time-barred. The court rejected this contention, concluding that all the acts against Accardi should properly be viewed as part of "a decade-long campaign against her . . . founded upon the department's unwritten policy that law enforcement has traditionally been 'a man's job' and, hence, 'no women need apply.' " (*Id.* at p. 350; see also *Watson v. Department of Rehabilitation* (1989) 212 Cal.App.3d 1271, 1290-1291 [261 Cal.Rptr. 204] [series of acts of discrimination and retaliatory harassment for complaining about discrimination constitutes a continuing violation].)

Some courts have applied a similar course of conduct theory to cases in which an employer fails to reasonably accommodate a disability. In *Goodman v. Boeing Co.* (1994) 75 Wash.App. 60 [877 P.2d 703] (affd. (1995) 127 Wash.2d 401 [899 P.2d 1265]), an employee claimed not only that she was not reasonably accommodated for her repetitive motion injury, but that she was subjected to verbal harassment and more difficult work assignments as a result of it, all in violation of the state antidiscrimination statute. The jury found in her favor and awarded her $1.1 million in damages for pain and suffering, lost wages and future medical expenses. The court had instructed the jury that it could award damages for actions outside the limitations period if it found a continuing violation. Boeing contended that the term "continuing violation" should have been defined, and that in any event the evidence was insufficient to support the finding of such a violation. The court rejected those contentions, viewing Boeing's actions as "a systematic policy of discrimination" and hence a continuing violation. (*Goodman, supra*, 877 P.2d at p. 713.) The "systematic policy" at issue in that case, however, was not an official policy, but an unofficial practice or course of conduct carried out against a particular employee. (See also *Martini v. Boeing Co.* (1997) 88 Wash.App. 442 [945 P.2d 248, 254], affd. (1999) 137 Wash.2d 357 [971 P.2d 45] [employer's continuing failure to address employee's request for reasonable accommodation was a continuing violation].)

In short, courts applying the continuing violation doctrine have tended toward a broader view of that doctrine when the cause of action involves ongoing harassment or ongoing failure to accommodate disability. Even courts that have adopted the three-part *Berry* test have been inclined to find a continuing violation under these circumstances, either concluding the employer's actions had little "permanence" or else giving little weight to the permanence factor.

With this overview in mind, we turn to the applicability of the continuing violation doctrine to the FEHA when an employer fails to reasonably accommodate a disability or to prevent disability discrimination.

### 2. *The Continuing Violation Doctrine and the FEHA*

Richards urges us in essence to adopt the broader "course of conduct" continuing violation theory employed by the Ninth Circuit and other courts as discussed above. CH2M Hill contends that Richards's broad interpretation of the continuing violation doctrine is contrary to the language of section 12960, which, as stated, prohibits a complaint from being filed "after the expiration of one year from the date upon which the alleged unlawful practice occurred." Further, the statute makes only two exceptions: a maximum 90-day extension when the claimant first becomes aware of the facts of the alleged practice after the expiration of the limitations period, and a maximum one-year extension when the claimant misidentifies the employer. CH2M Hill argues that to extend the continuing violation doctrine beyond the well-established "equitable tolling" rule would be contrary to the plain language of the statute.

CH2M Hill's statutory argument begs the question whether an "unlawful practice" within the meaning of section 12960 includes a course of conduct, such as a continuing failure to reasonably accommodate a disabled employee. We considered the meaning of the term "unlawful practice" under the FEHA in *Walnut Creek Manor v. Fair Employment & Housing Com.* (1991) 54 Cal.3d 245, 267-273 [284 Cal.Rptr. 718, 814 P.2d 704] (*Walnut Creek Manor*). There, we construed section 12987, which authorized a payment of punitive damages up to a statutory maximum of $1,000 (as adjusted for inflation) for every "unlawful practice" of housing discrimination under section 12955. The owner of an apartment building passed over a Black applicant for apartments in favor of non-Black applicants 35 times during the relevant period. The Fair Employment and Housing Commission awarded the complainant $1,000 for each of the 35 instances of discrimination, but we held that only a single $1,000 award was warranted. The key to our inquiry was the meaning of the term "unlawful practice." As we stated: "The term . . . is unambiguous. As both lay and legal dictionaries state, the term 'practice' means *a course of conduct*, i.e., 'to do or perform often, customarily, or habitually; to make a practice of' (Webster's New Internat. Dict. [(2d ed. 1958)] p. 1937, col. 3); '[r]epeated or customary action; habitual performance; a succession of acts of similar kind; custom; usage' (Black's Law Dict. [(6th ed. 1990)] p. 1172, col. 1). Given the plain meaning of the term, we conclude that in refusing to rent to [the complainant] on the basis of race, respondents committed a single

'unlawful practice' within the meaning of the statute." (*Walnut Creek Manor*, *supra*, 54 Cal.3d at p. 269, italics added.)

We further clarified that "[o]ur conclusion that respondents are liable for only one punitive damages award does not mean that a single 'act' of discrimination is not a violation of the act or cannot support an accusation and finding of an 'unlawful practice.' The case law is to the contrary. [Citations.] In every case the issue simply is whether the act or acts complained of suffice to show a discriminatory practice in violation of the statute. [Citations.] We merely hold that, for the purposes of the authorized remedies, multiple acts of discrimination against the same complainant on the same unlawful basis establish only one unlawful practice." (*Walnut Creek Manor*, *supra*, 54 Cal.3d at pp. 269-270.)

CH2M Hill correctly argues that *Walnut Creek Manor* decided the term "unlawful practice" in a different context. But it does not follow, as the company further argues, that the case is inapposite. Our holding in *Walnut Creek Manor* undercuts CH2M Hill's contention that Richards's more expansive interpretation of the continuing violation doctrine is inconsistent with the language of the FEHA. At the very least, the term "unlawful practice," in the context of the statute of limitations, is ambiguous. CH2M Hill stresses the discrete nature of each of its actions, e.g., the failure to fix the wheelchair ramp, the failure to adjust the elevator, the delay in transferring Richards to the Sacramento office, each with its own separate circumstances and different termination date. But Richards's characterization of CH2M Hill's failure to reasonably accommodate her disability over a five-year period as part of a single course of conduct—informed by management's mistaken belief that her MS was a preexisting condition and that she was trying to "milk" the company—is at least equally plausible and equally consistent with the meaning of the term "unlawful practice." Because the plain language of the statute by itself does not definitively determine the proper scope of the continuing violation doctrine, we turn to the overall purpose of the FEHA to determine which interpretation of that doctrine best serves its legislative objectives.

■   We begin with section 12993, subdivision (a), which states that the provisions of the FEHA "shall be construed liberally for the accomplishment of the purposes thereof." This liberal construction extends to interpretations of the FEHA's statute of limitations: "In order to carry out the purpose of the FEHA to safeguard the employee's right to hold employment without experiencing discrimination, the limitations period set out in the FEHA should be interpreted so as to promote the resolution of potentially meritorious claims on the merits." (*Romano v. Rockwell Internat. Inc.* (1996) 14 Cal.4th 479, 493-494 [59 Cal.Rptr.2d 20, 926 P.2d 1114] (*Romano*).)

*Romano* also concluded that it is contrary to the purposes of the FEHA to interpret its statute of limitations to encourage premature litigation at the expense of informal conciliation. We held that the statute of limitations on a FEHA claim for discriminatory termination does not begin to run at the point at which an employee is notified of the termination, but rather when the termination actually occurs. One of the reasons for our holding was that a contrary rule "would promote premature and potentially destructive claims, in that the employee would be required to institute a complaint with the Department while he or she still was employed, thus seeking a remedy for a harm that had not yet occurred. . . . [S]uch a rule would reduce sharply any chance of conciliation between employer and employee and draw the Department into investigations that might have been avoided through informal conciliation. [Citation.] Such a rule also would place upon the courts of this state the burden of prematurely adjudicating claims that a termination in violation of the FEHA has occurred." (*Romano, supra*, 14 Cal.4th at pp. 494-495.)[4]

Similarly, in *Mullins v. Rockwell Internat. Corp.* (1997) 15 Cal.4th 731 [63 Cal.Rptr.2d 636, 936 P.2d 1246] (*Mullins*), a non-FEHA breach of contract case, we held that the statute of limitations action for constructive discharge does not commence when the employee's working conditions become intolerable, but rather when the employee resigns. We stated: "As a practical matter, a rule requiring a lawsuit to be filed as soon as intolerable conditions begin would interfere with informal conciliation in the workplace. The filing of a lawsuit not only would stifle the parties' efforts to resolve differences informally; it would in most cases prompt the employee to resign at the earliest date to avoid the awkwardness of maintaining employment while pursuing litigation against his or her employer. The statute of limitations should not force the employee to institute premature legal proceedings, whether at the time the employer announces an intention to fire the employee, or at the time the employer begins to coerce a resignation by creating or knowingly permitting intolerable working conditions." (*Id.* at p. 741.)

As in *Romano* and *Mullins*, we do not believe the FEHA statute of limitations should be interpreted to give a disabled employee engaged in the

---

[4]As *Romano* recognized, an employee bringing a FEHA action may not sue an employer directly but must first file a complaint with the Department. (§ 12960.) If the Department determines that it will not issue an "accusation" after the filing of the complaint, or when 150 days have elapsed after the filing of the complaint, it "shall issue" a "right-to-sue" notice to the aggrieved employee. (§ 12965, subd. (b).) Additionally, "[i]f the department determines after investigation that the complaint is valid, [it] shall immediately endeavor to eliminate the unlawful employment practice complained of by conference, conciliation, and persuasion." (§ 12963.7, subd. (a).)

While CH2M Hill and the dissent argue that attempted conciliation is part of the FEHA process, and therefore informal conciliation prior to filing a complaint is of less importance, we affirmed in *Romano* that informal conciliation was to be encouraged before the institution of a complaint with the Department, the first formal step toward a lawsuit.

process of seeking reasonable workplace accommodation or ending disability harassment two unappealing choices: on the one hand resigning and bringing legal action soon after the first signs that her rights have been violated, or on the other hand attempting to persist in the informal accommodation process and risk forfeiture of the right to bring such an action altogether. Nor, as we have recognized, is the third choice—retaining employment while bringing formal legal action against the employer—a viable option for many employees. (See *Mullins, supra,* 15 Cal.4th at p. 741.) In light of the legislative directive that the FEHA be liberally construed "to safeguard the employee's right to hold employment without experiencing discrimination" (*Romano, supra,* 14 Cal.4th at pp. 493-494), section 12960 should not be interpreted to impose serious practical difficulties on an employee's ability to vindicate this right through litigation if it can be reasonably interpreted otherwise.

Indeed, to hold that the statute of limitations begins to run at the first notice that an employee's rights have been violated would create the following incongruity: Under *Mullins,* an employee faced with discrimination or harassment that rises to the level of a constructive discharge would not have to take formal legal action until a year after resignation, giving him or her ample time for informal conciliation, but an employee confronted with lesser forms of harassment or discrimination would need to observe a strict one-year deadline from the time of the first unlawful employer activity. Of course, an employee confronted with such unlawful activity will generally not know whether it will eventually rise to the level of a constructive discharge. Therefore, the employee will be encouraged to take legal action before the informal conciliation process has run its course. Such a rule would effectively nullify our holding in *Mullins.*

There is particularly good reason to view the failure over time to reasonably accommodate a disabled employee as a single course of conduct. As the federal regulations implementing the duty of reasonable accommodation in the Americans with Disabilities Act (42 U.S.C. § 12111 et seq.) make clear, "[t]o determine the appropriate reasonable accommodation it may be necessary for the [employer] to initiate an informal, interactive process" with the disabled employee. (29 C.F.R. § 1630.2(*o*)(3) (2000).) "The appropriate reasonable accommodation is best determined through a flexible, interactive process that involves both the employer and the [employee] with a disability." (29 C.F.R. Appen. to 1630, Interpretive Guidance on Title I of the Americans with Disabilities Act, foll. § 1630.9, Process of Determining the Appropriate Reasonable Accommodation (2000).) Thus, reasonable accommodation is often an ongoing process rather than a single action. As this case well illustrates, this process may have many facets and take a number of

different forms. As with harassment, an instance of an employer's failure to accommodate that in isolation may seem trivial can assume greater significance and constitute a greater injury when viewed as one of a series of such failures. Thus, as discussed, courts applying the *Berry* test to the area of reasonable accommodation, as well as courts applying a broader test, have found a continuing violation for the entire course of the employer's unlawful conduct. (*Lewis v. Board of Trustees of Alabama State University, supra,* 874 F.Supp. at p. 1304; *Bodiford v. State of Alabama, supra,* 854 F.Supp. at p. 891; *Martini v. Boeing Co., supra,* 945 P.2d at p. 254; *Goodman v. Boeing Co., supra,* 877 P.2d 703.) We believe that to interpret the FEHA statute of limitations in a way that does not short-circuit the reasonable accommodation process is consistent with both the letter and the spirit of the law.

CH2M Hill objects that allowing employees to delay filing a complaint as long as they are seeking accommodation allows employees to control the date the action accrues, to the severe disadvantage of the employer. Such concern is overstated. As we said in *Mullins* in the context of constructive discharge: "Rockwell objects that if the statute of limitations runs from the date of actual termination of employment pursuant to a constructive discharge, the employee will control the limitations period, because it is up to the employee to decide when to leave his or her employment . . . . If the employee controls the date on which the statute of limitations begins to run, Rockwell argues, employers will live in ignorance of an impending lawsuit until memories have faded and evidence is difficult to gather. . . . [¶] . . . [¶] Rockwell's concern to avoid vesting employees with sole control over the commencement of the statute of limitations period . . . is misplaced . . . . The essence of constructive discharge is that it is a termination of employment secured *by the employer* through indirect means. The employer remains in control in that he or she coerces the employee's resignation. . . . Further, the employer, who has created or permitted the persistence of known intolerable conditions, should not be able to complain of delay when the employee retains employment in the hope that conditions will improve or that informal conciliation may succeed." (*Mullins, supra,* 15 Cal.4th at pp. 739-740, fn. omitted.) Similarly, the employer that creates or permits a persistent pattern of harassment or failure to reasonably accommodate that makes its working conditions unfavorable to the employee, even if such pattern or failure does not rise to the level of constructive discharge, cannot complain of delay when the employee retains employment in hopes that informal conciliation will succeed.

On the other hand, we find merit in CH2M Hill's argument that permitting an employee *indefinitely* to delay the filing of a lawsuit based on the employer's failure to reasonably accommodate disability or on disability

harassment would be contrary to the FEHA's statute of limitations and potentially prejudicial to the employer. When "the hope that conditions will improve or that informal conciliation may succeed" (*Mullins, supra*, 15 Cal.4th at p. 740) is unreasonable, as when an employer makes clear that it will not further accommodate an employee, justification for delay in taking formal legal action no longer exists. If the employer has made clear in word and deed that the employee's attempted further reasonable accommodation is futile, then the employee is on notice that litigation, not informal conciliation, is the only alternative for the vindication of his or her rights. Barring a constructive discharge, it is at that point the statute of limitations for the violation begins to run.

■ Accordingly, we adopt a modified version of the *Berry* test. As in *Berry*, we hold that an employer's persistent failure to reasonably accommodate a disability, or to eliminate a hostile work environment targeting a disabled employee, is a continuing violation if the employer's unlawful actions are (1) sufficiently similar in kind—recognizing, as this case illustrates, that similar kinds of unlawful employer conduct, such as acts of harassment or failures to reasonably accommodate disability, may take a number of different forms (see *Fielder v. UAL Corp., supra*, 218 F.3d at pp. 987-988); (2) have occurred with reasonable frequency; (3) and have not acquired a degree of permanence. (*Berry, supra*, 715 F.2d at p. 981.) But consistent with our case law and with the statutory objectives of the FEHA, we further hold that "permanence" in the context of an ongoing process of accommodation of disability, or ongoing disability harassment, should properly be understood to mean the following: that an employer's statements and actions make clear to a reasonable employee that any further efforts at informal conciliation to obtain reasonable accommodation or end harassment will be futile.

■ Thus, when an employer engages in a continuing course of unlawful conduct under the FEHA by refusing reasonable accommodation of a disabled employee or engaging in disability harassment, and this course of conduct does not constitute a constructive discharge, the statute of limitations begins to run, not necessarily when the employee first believes that his or her rights may have been violated, but rather, *either* when the course of conduct is brought to an end, as by the employer's cessation of such conduct or by the employee's resignation, *or* when the employee is on notice that further efforts to end the unlawful conduct will be in vain. Accordingly, an employer who is confronted with an employee seeking accommodation of disability or relief from disability harassment may assert control over its legal relationship with the employee either by accommodating the employee's requests, or by making clear to the employee in a definitive manner that

it will not be granting any such requests, thereby commencing the running of the statute of limitations.

### 3. *Application to the Present Case*

■ In the present case, neither the trial court nor the Court of Appeal applied the proper standard for determining a continuing violation. The trial court appears to have implicitly found to be true the first two factors of the above stated test—similarity in the types of unlawful conduct and reasonable frequency; it stated, in the context of denying CH2M Hill's motion for a new trial on statute of limitations grounds, that the company had engaged in "a continuing pattern of harassment, neglect and a violation of her rights in terms of accommodations, even reasonable accommodations," a pattern "that continued on up until the day she left, practically." From our review of the record, stated above, there is substantial evidence to support the trial court's conclusions. But the trial court did not consider the "permanence" of the employer's conduct. The Court of Appeal, while correctly concluding that Richards made certain claims that fell within the limitations period—failure to reasonably accommodate in connection with the fire escape plan, hallway access, and access to the elevator and supply rooms—incorrectly adopted the narrow view that the statute of limitations begins to run as soon as the disabled employee is on notice that his or her rights have been violated. It thus did not consider whether CH2M Hill and Richards continued to be engaged in an informal conciliation process to resolve the latter's grievances concerning the reasonable accommodation of her disability.

CH2M Hill argues that, at several critical junctures over the five-year period in question, it made clear to Richards that she was not going to be reasonably accommodated and that "nothing was going to change." Richards, on the other hand, claims that she received mixed signals on her accommodation requests throughout the period, including ambiguous statements from human resource manager Carol Uhouse that she would deal with Richards's requests "[her] way." Because the standard we announce is new, the proper course is to remand to the trial court for application of the continuing violation test formulated above to the facts of this case. (See *Berry, supra,* 715 F.2d at p. 982 [after formulating standard, the matter is remanded to the trial court for "fact-specific inquiry"].)[5]

---

[5]Because we remand on an issue that may cause the redetermination of CH2M Hill's liability, we do not decide the issue pertaining to damages that the company raised in the answer to Richards's petition for review, i.e., whether an employee may obtain monetary damages for backpay when the employee resigns and the resignation does not rise to the level of a constructive discharge.

## III. DISPOSITION

The judgment of the Court of Appeal is reversed. The cause is remanded with directions to remand to the trial court for reconsideration of CH2M Hill's motion for a new trial on statute of limitations grounds in light of this opinion.

George, C. J., Kennard, J., and Chin, J., concurred.

**BROWN, J.,** Dissenting.—As with any statute of limitations, Government Code section 12960[1] reflects a considered balancing of interests. Under the Fair Employment and Housing Act (FEHA; § 12900 et seq.), the employee has a right to employment free of invidious discrimination, and the employer has a right to fair notice of alleged discriminatory practices. (See generally *Jordache Enterprises, Inc. v. Brobeck, Phleger & Harrison* (1998) 18 Cal.4th 739, 756 [76 Cal.Rptr.2d 749, 958 P.2d 1062].) Although the continuing violation doctrine assumes several forms, it has developed principally as an equitable exception to the limitations period for antidiscrimination laws. (See, e.g., *Huckabay v. Moore* (5th Cir. 1998) 142 F.3d 233, 238; *Moskowitz v. Trustees of Purdue University* (7th Cir. 1993) 5 F.3d 279, 281-282.) Flagrantly disregarding this rationale as well as the statutory language, the majority has adopted a broad, standardless variant that will effectively transform section 12960 into a statute of nonlimitation. As plaintiff's counsel succinctly defined the new rule: the statute of limitations "starts to run when the [employer's discriminatory] conduct stops." Since the employee need not place the employer on notice of alleged discriminatory acts, the complaint could encompass decades. Indeed, complainants may now assert FEHA causes of action in any circumstance involving two or more unlawful practices regardless of how much time separates them, with every incentive to delay claims and maximize recovery. As the Court of Appeal reasonably concluded: "the continuing violation doctrine [has never been] a doctrine of continued violations by which the most ancient claims can hijack more recent claims to ride through the courtroom door" contrary to express statutory language. Until now. Since this decision does violence to both the statute of limitations and to the entire statutory scheme, which is intended to protect not only the individual employee but coworkers and the public from the pernicious effects of employment discrimination, I dissent.

Section 12960 states, "No complaint may be filed after the expiration of one year from the date upon which the alleged unlawful practice . . . occurred." The statute sets forth only two circumstances in which "this period may be extended . . . : (a) for not to exceed 90 days following the

---

[1]All statutory references are to the Government Code.

expiration of that year, if a person allegedly aggrieved by an unlawful practice first obtained knowledge of the facts of the alleged unlawful practice after the expiration of one year from the date of their occurrence, or (b) for not to exceed one year following a rebutted presumption of the identity of the person's employer under Section 12928, in order to allow a person allegedly aggrieved by an unlawful practice to make a substitute identification of the actual employer."

Both these exceptions are premised on equitable considerations. The first is a statutory analogue of the equitable tolling variant of the continuing violation doctrine articulated in *Moskowitz v. Trustees of Purdue University, supra,* 5 F.3d 279. The court in *Moskowitz* explained its rationale as follows: "If it is only with the benefit of hindsight, after a series of discriminatory acts, that the plaintiff can realize that he is indeed a victim of unlawful discrimination, he can sue in regard to all of the acts provided he sues promptly after learning their character, even if the statute of limitations has run on all of them. If, however, he knows or with the exercise of reasonable diligence would have known after each act that it was discriminatory and had harmed him, he may not sit back and accumulate all the discriminatory acts and sue on all within the statutory period applicable to the last one. So the fact that a series of discriminatory or otherwise unlawful acts is indeed a series, a continuum, rather than a concatenation of unrelated acts, will delay the deadline for suing with respect to the earliest acts in the series *only if their character was not apparent when they were committed but became so when viewed in the light of the later acts.*" (*Id.* at pp. 281-282, italics added; see also *Huckabay v. Moore, supra,* 142 F.3d at pp. 238-239.) Similarly, the first exception to section 12960 allows the complainant additional, albeit limited, time to recognize a discriminatory animus and seek redress.

The second exception was recently enacted (see Stats. 1999, ch. 797, § 2) in response to concern that "the employee is not always able to determine the precise name or the identity of his or her employer. The problem occurs, for example, where there are parent and subsidiary corporations with similar names, but the employee is unaware of any distinction between the two entities. Very often these distinct entities are housed in the same facility which further complicate[s] identification of the proper party to be named. [¶] If the employee inadvertently misidentifies the employer in the original [Department of Fair Employment and Housing (Department)] complaint, the real employer may later claim that the employee has failed to exhaust his or her administrative remedies prior to suit within the time prescribed by law and is barred from proceeding with litigation." (Sen. Rules Com., Off. of Sen. Floor Analyses, Analysis of Sen. Bill No. 211 (1999-2000 Reg. Sess.) as amended Sept. 1, 1999, p. 4.) Accordingly, the Legislature provided for "a

rebuttable presumption that 'employer,' as defined by [the FEHA,] includes any person or entity identified as the employer on the employee's Federal Form W-2 (Wage and Tax Statement)" (§ 12928; see Stats. 1999, ch. 797, § 1) and extended the one-year statute of limitations an additional year in the event that presumption is rebutted "to allow a person allegedly aggrieved by an unlawful practice to make a substitute identification of the actual employer." (§ 12960.)

Plainly, the Legislature is capable of expanding the statutory period when it perceives the need. The majority offers no principled justification or rationale for displacing this critical component of the FEHA and undermining its goals. (Cf. *Stevenson v. Superior Court* (1997) 16 Cal.4th 880, 912-919 [66 Cal.Rptr.2d 888, 941 P.2d 1157] (dis. opn. of Brown, J.) [allowing cause of action for wrongful termination in violation of public policy based on the FEHA is inconsistent with legislative intent to provide administrative as well as judicial review to vindicate acts of employment discrimination].) Just as the Legislature must determine the appropriate limitations period, it is equally for the Legislature to create any exceptions. The courts may impose on that prerogative, if at all, only in a manner consistent with the purpose and intent of the underlying statutory scheme. This the majority fails to do. (See *post*, pp. 830-832.) A nonstatutory "course of conduct" exception does not comport in letter or spirit with the evident intent of limiting extensions to narrowly prescribed equitable circumstances. Moreover, nothing in *Walnut Creek Manor v. Fair Employment & Housing Com.* (1991) 54 Cal.3d 245 [284 Cal.Rptr. 718, 814 P.2d 704] (*Walnut Creek Manor*); *Romano v. Rockwell Internat., Inc.* (1996) 14 Cal.4th 479 [59 Cal.Rptr.2d 20, 926 P.2d 1114] (*Romano*); or *Mullins v. Rockwell Internat. Corp.* (1997) 15 Cal.4th 731 [63 Cal.Rptr.2d 636, 936 P.2d 1246] (*Mullins*) supports adopting an unduly expansive variant of the continuing violation doctrine.

The majority cites *Walnut Creek Manor, supra*, 54 Cal.3d at page 269, for the proposition that the term "unlawful practice" as used in the FEHA includes any series of discriminatory acts. (Maj. opn., *ante*, at pp. 818-819.) That decision did not implicate the statute of limitations, and the majority's reliance is at best an inversion of its analysis. In *Walnut Creek Manor*, an apartment owner rented apartments to 35 non-Black applicants after refusing to rent to a Black man. Because the court found this was " 'a succession of acts of similar kind,' " i.e., a "practice" as defined by the dictionary, it constituted a single unlawful practice for purposes of imposing statutory punitive damages under the FEHA. (*Walnut Creek Manor, supra*, 54 Cal.3d at p. 269.) "Each discriminatory act in furtherance of the refusal to rent serves merely as proof of the alleged practice [rather than constituting an

independent violation]. [Citation.]" (*Id.* at p. 270.) Without any particular regard for this reasoning, the majority seizes on one of several dictionary definitions of "practice" the court listed in its discussion (*id.* at p. 269), one having no particular bearing on the ultimate holding. (See *id.* at pp. 268-273.) From this thread, it fashions a "course of conduct" rule allowing a FEHA complainant to transmute a series of discrete wrongful acts into a single unlawful practice as long as she alleges each act is motivated by the same discriminatory animus. And, regardless of how ancient in time the first act in the series, the statute of limitations is measured from the last. Thus, even though from January 1990 through January 1992 defendant repeatedly told plaintiff it did not intend to and would not make any further accommodations of her disability, the majority's holding excuses her delay in asserting a violation of the FEHA for a full year or more after the limitations period expired on those acts of discrimination. (See *Moskowitz v. Trustees of Purdue University, supra*, 5 F.3d at p. 282; *Huckabay v. Moore, supra*, 142 F.3d at p. 239.) This rule cannot be reconciled with the Legislature's implicit intent that the limitations period be strictly observed except in narrowly defined circumstances.

Equally without critical analysis, the majority invokes the admonition that provisions of the FEHA, including the statute of limitations, "shall be construed liberally for the accomplishment of [its] purposes . . . ." (§ 12993, subd. (a); see *Romano, supra*, 14 Cal.4th at pp. 493-494.) Liberal construction is a mandate to fully effectuate, not a license to abrogate. Moreover, the reasoning in *Romano* is entirely distinguishable; and the majority fails to explain why it is necessary to create a course of conduct exception to the limitations period, which effectively nullifies section 12960, in order to accomplish the purpose of the FEHA.

Although *Romano* raised a question of when the statute of limitations began to run, the continuing violation doctrine was not at issue. The facts did not involve, as here, a multiplicity of acts but a single allegation of wrongful termination in violation of the FEHA's proscription against age discrimination. The court concluded the statute began to run on the date of actual termination—rather than when the employee was informed of his impending discharge—because otherwise he "would be required to institute a complaint with the Department while he or she still was employed, *thus seeking a remedy for a harm that had not yet occurred.*" (*Romano, supra*, 14 Cal.4th at p. 494, italics added.) This reasoning does not apply in the present context. Since plaintiff knew, or reasonably should have known, that discriminatory harm had occurred well prior to January 1993, she did not need to wait for some definitive unlawful practice to avoid instituting her complaint prematurely. Given that actionable harm, she would not "risk forfeiture of the right to bring such an action altogether." (Maj. opn., *ante*, at p. 821.)

The relevance of *Mullins* is questionable because that case did not include a FEHA action or require construction of section 12960. In any event, its reasoning is equally inapposite. As in *Romano*, the plaintiff asserted a single wrongful act of constructive discharge; and the court expressed concern that in that context "[t]he statute of limitations should not force the employee *to institute premature legal proceedings*" (*Mullins, supra*, 15 Cal.4th at p. 741, italics added), i.e., prior to actual termination. (See *id.* at p. 742.) While the plaintiffs in *Romano* and *Mullins* may have needed protection from the risk of forfeiting their claims due to the uncertainty of what conduct short of actual or constructive discharge was actionable, no such uncertainty arises when an employer commits specific and discrete acts of disability discrimination. (See *Mullins*, at p. 741; *Romano, supra*, 14 Cal.4th at p. 494.)

Nor does the reasoning of *Accardi v. Superior Court* (1993) 17 Cal.App.4th 341 [21 Cal.Rptr.2d 292] assist the majority. Because the Court of Appeal reviewed the case on demurrer, it necessarily took an expansive view of the plaintiff's factual allegations that she had been subjected to sexual harassment as the result of a hostile work environment. Some of the alleged harassment occurred outside the limitations period, but the court allowed that it could be relevant to establish the discriminatory character of acts that were not time-barred. Although the later actions "if viewed as solitary events, could be nondiscriminatory, and therefore legitimate, . . . Accardi may be able to prove that [they] were a continuation of prior discriminatory practices and were used as a pretext to provide a deceptive cover of legitimacy." (*Id.* at p. 351; cf. *Walnut Creek Manor, supra*, 54 Cal.3d at p. 270.) The present case comes to the court after trial. We therefore know what plaintiff knew and when she knew it. By her own admission, she understood each failure to accommodate as animus toward her disability. Rather than protecting the right to be free of invidious harassment, the majority's invocation of a course of conduct exception to section 12960 in these circumstances gives employees who experience discrimination every incentive to forbear seeking redress and to wait as long as they want to accumulate years of unlawful practices before filing a FEHA complaint, thus rendering the statute of limitations a nullity.

The majority also adverts to preserving the opportunity for "informal conciliation." (Maj. opn., *ante*, at p. 821.) This rationale falls short in several respects. First, an employee need not file a FEHA complaint immediately upon an act of discrimination or harassment but has a full year thereafter to do so, during which time informal conciliation efforts may proceed. Second, such efforts need not cease simply because the employee files a complaint to toll the statute. They may well continue while the Department investigates and initiates its own conciliation process or determines it should issue the

complainant a right-to-sue letter, which may be a period of an additional 150 days or more. (See § 12965, subd. (b).) In the event the Department does not pursue its own investigation, the employee has a year from issuance of the right-to-sue letter within which to institute civil proceedings. (*Ibid.*) As a disincentive to the employer, any retaliation for filing a FEHA complaint will give rise to an additional unlawful practice charge. (§ 12940, subd. (h).)

Finally, and contrary to the majority's implication, the FEHA emphasizes *formal* conciliation, not only to benefit the individual employee but to effectuate the act's broader goals. Section 12930 expressly directs the Department to appoint conciliators and to investigate and conciliate complaints of alleged unlawful practices. (See also § 12963.7.) After receiving a complaint, the Department must serve a copy on the employer within 45 days, but has the discretion to keep the complainant's name confidential. (§ 12962.) Thus, the employer has adequate notice of the allegations but the employee can be shielded from retaliation. If the Department deems a claim valid, it seeks to resolve the matter—in confidence—by conference, conciliation, and persuasion. (§ 12963.7.) Only if the Department fails to act within 150 days after the filing of a complaint, or earlier determines not to take administrative action, must it issue a right-to-sue letter as a prerequisite to judicial action. (§ 12965, subd. (b); see *Rojo v. Kliger* (1990) 52 Cal.3d 65, 83 [276 Cal.Rptr. 130, 801 P.2d 373].)

This compliance structure affords the Department and the Fair Employment and Housing Commission (the Commission) an initial opportunity to utilize their respective expertise both to eliminate "a particular unlawful employment practice *and* to prevent its recurrence." (*Dyna-Med, Inc. v. Fair Employment & Housing Com.* (1987) 43 Cal.3d 1379, 1390 [241 Cal.Rptr. 67, 743 P.2d 1323], italics added; see *State Personnel Bd. v. Fair Employment & Housing Com.* (1985) 39 Cal.3d 422, 432 [217 Cal.Rptr. 16, 703 P.2d 354].) As to the individual complainant, the goal is to "make the aggrieved employee whole in the context of the employment." (*Dyna-Med, Inc.*, at p. 1387.) More generally, "on finding harassment [or discrimination] the Commission will order such corrective measures as will benefit both the complainant *and others*, including that the employer cease and desist the practice, report the manner of compliance, and take other remedial action as appropriate. In addition, the Commission will thereafter conduct [or direct the Department to conduct] a compliance review to see that the employer is fully obeying the order. (§ 12973.) Hence, the administrative procedure serves the statutory purpose of providing effective remedies that will eliminate the discriminatory practice and prevent its recurrence, not just as to the immediate victim, but as to all employees, present and future. (§ 12920.)" (*Peralta Community College Dist. v. Fair Employment & Housing Com.*

(1990) 52 Cal.3d 40, 53 [276 Cal.Rptr. 114, 801 P.2d 357], fns. omitted; *State Personnel Bd.*, at pp. 429, 432; see *Rojo v. Kliger, supra,* 52 Cal.3d at p. 83.) In *Jennings v. Marralle* (1994) 8 Cal.4th 121 [32 Cal.Rptr.2d 275, 876 P.2d 1074], the court recognized the significance of this remediation authority in effectuating the broader goals of the FEHA: The Legislature's "aim was not so much to redress each discrete instance of individual discrimination as to eliminate the egregious and continued discriminatory practices of economically powerful organizations." (*Id.* at p. 134.)

The Legislature has expressly declared, "It is the existing policy of the State of California . . . that procedures be established by which allegations of prohibited harassment and discrimination may be filed, timely and efficiently investigated, and fairly adjudicated, and that agencies and employers be required to establish affirmative programs which include prompt and remedial internal procedures and monitoring so that worksites will be maintained free from prohibited harassment and discrimination . . . . To further this intent, the Legislature enacts [the FEHA]." (Stats. 1984, ch. 1754, § 1, pp. 6403-6404; see also Stats. 1992, ch. 911, § 1(a), p. 4230 ["primary public policy of the [FEHA] is the prevention and elimination of unlawful employment practices"].) Thus, not only the FEHA's remedies but its procedures as well vindicate the underlying public policy to eliminate discrimination.

Although as an alternative to the administrative process, a complainant may seek judicial relief upon the issuance of a right-to-sue letter, "current Department policy is to issue the letter only after the Department has invited the respondent to make settlement offers and settlement is not achieved." (*Rojo v. Kliger, supra,* 52 Cal.3d at p. 84, fn. 11 [citing letter from the director of the Department to the Chief Justice of the Supreme Court dated June 9, 1989].) Such a position is consistent with "the compliance structure of FEHA[, which] encourages cooperation in the administrative process. . . . That helps deter strategies of 'holding out' for court damages in inappropriate cases. Further, the possibility that an action might lead to punitive damages may enhance the willingness of persons charged with violations to offer fair settlements during the conciliation process." (*Commodore Home Systems, Inc. v. Superior Court* (1982) 32 Cal.3d 211, 218 [185 Cal.Rptr. 270, 649 P.2d 912], fn. omitted.) Administrative procedures also allow a compliant employer to rectify discriminatory practices without costly and protracted litigation, thus benefiting all employees.

As the rationale of *Jennings* makes clear, to fulfill the FEHA's public policy courts must consider "the legislative intent reflected in [its] various provisions . . . ." (*Jennings v. Marralle, supra,* 8 Cal.4th at p. 124.) Read as

a whole, these various provisions underscore the necessary balance of interests the Legislature strives to maintain in executing the collective public policy undergirding the FEHA: employees must be protected from discrimination and recompensed for violations of their rights; employers must rectify unlawful practices and maintain compliance without undue economic burden; the public must remain confident that antidiscrimination policies are enforced without resulting in a hostile business environment. With their broad remedial and oversight authority, the Commission and the Department can fully realize the "vital policy interests embodied in FEHA, i.e., the resolution of disputes and elimination of unlawful employment practices by conciliation. [Citations.]" (*Yurick v. Superior Court* (1989) 209 Cal.App.3d 1116, 1123 [257 Cal.Rptr. 665].) In sum, it is the administrative process, not informal conciliation, that constitutes the defining structure of FEHA enforcement.

To suggest adherence to the statute of limitations may be sacrificed to informal conciliation also misperceives the wider purpose of the FEHA. While the stated policy of the act is "to protect and safeguard the right and opportunity of all persons to seek, obtain, and hold employment without discrimination or abridgement on account of" enumerated characteristics (§ 12920), it does so because "the practice of denying employment opportunities and discriminating in the terms of employment for such reasons foments domestic strife and unrest, deprives the state of the fullest utilization of its capacities for development and advance, and substantially and adversely affects the interest of employees, employers, and the public in general." (*Ibid.*) The majority has now placed vindication of this broad public policy in the hands of individuals whose only concern is their own narrow interests.

"Statutes of limitations are not simply technicalities. On the contrary, they have long been respected as fundamental to a well-ordered judicial system." (*Board of Regents v. Tomanio* (1980) 446 U.S. 478, 487 [100 S.Ct. 1790, 1796, 64 L.Ed.2d 440].) " '[T]he period allowed for instituting suit inevitably reflects a value judgment concerning the point at which the interests in favor of protecting valid claims are outweighed by the interests in prohibiting the prosecution of stale ones.' " (*Delaware State College v. Ricks* (1980) 449 U.S. 250, 259-260 [101 S.Ct. 498, 505, 66 L.Ed.2d 431], quoting *Johnson v. Railway Express Agency, Inc.* (1975) 421 U.S. 454, 463-464 [95 S.Ct. 1716, 1721-1722, 44 L.Ed.2d 295].) Statutes of repose are "designed to promote justice by preventing surprises through the revival of claims that have been allowed to slumber until evidence has been lost, memories have faded, and witnesses have disappeared. The theory is that even if one has a just claim it is unjust not to put the adversary on notice to defend within the

period of limitation and that the right to be free of stale claims in time comes to prevail over the right to prosecute them." *(Telegraphers v. Ry. Express Agency* (1944) 321 U.S. 342, 348-349 [64 S.Ct. 582, 586, 88 L.Ed. 788]; accord, *Jordache Enterprises, Inc. v. Brobeck, Phleger & Harrison, supra,* 18 Cal.4th at p. 756.)

These principles apply equally to the FEHA, particularly in light of the relatively short limitations period and the few statutory exceptions. Contrary to their counsel and without any regard for legislative intent and prerogative, the majority has crafted an exception to section 12960 that strikes at the heart of the FEHA's defining structure. No one condones discrimination on any invidious basis. The majority, however, submits no rationale for eliminating equitable considerations from the continuing violation doctrine and adopting a course of conduct exception that in practice will relegate the statute of limitations to oblivion and undermine rather than promote the FEHA's goal of eliminating discrimination for all, not just a few.