Filed 8/9/16  Salyer v. University of Redlands CA4/1

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA


GREG SALYER,

    Plaintiff and Appellant,

v.

UNIVERSITY OF REDLANDS,

    Defendant and Respondent.

D069448

(Super. Ct. No. CIVDS1111907)


APPEAL from a judgment of the Superior Court of San Bernardino County, John M. Pacheco, Judge.  Affirmed.

Law Offices of Sandra L. Noël, Sandra L. Noël; Law Offices of Jeremy J. Waitman and Jeremy J. Waitman for Plaintiff and Appellant.

Musick, Peeler & Garrett and Adam L. Johnson for Defendant and Respondent.

Plaintiff Greg Salyer appeals a summary judgment in favor of defendant University of Redlands (UR) in his unlawful employment retaliation action against it.  On appeal, he contends the trial court erred by concluding there were no triable issues of material fact and UR was entitled to judgment as a matter of law.  He argues the trial

court erred by: (1) concluding the only acts by UR that were actionable and relevant to his retaliation cause of action were those that occurred after he filed his first complaint with the California Department of Fair Employment and Housing (DFEH) in November 2009; (2) concluding he did not present sufficient evidence to support a reasonable inference that UR took an adverse employment action in retaliation against him after he filed his first DFEH complaint in November 2009; (3) concluding he did not present sufficient evidence to support a reasonable inference that UR's proffered legitimate, nonretaliatory reasons for its acts were a mere pretext for retaliation against him; (4) considering evidence of misconduct allegations made against him; (5) concluding UR paid all compensation due him when it paid him his contract compensation in lieu of services for the remaining 20 months of that contract; and (6) not deeming as true the 104 disputed facts asserted in his separate statement of disputed facts, none of which UR specifically disputed.

## FACTUAL AND PROCEDURAL BACKGROUND

In 2007, UR and Salyer entered into a contract providing that he was appointed as an associate professor and named the director of UR's Johnston Center for Integrative Studies. The contract stated it was a "renewable 11-months per year, three-year contract[,] effective August 1, 2007." His annual base salary was $85,500 and he also would receive an additional $5,000 stipend for each of the first two years of the contract. Salyer's supervisor was Barbara Morris, dean of the College of Arts and Sciences.

2

During the relevant time period in this case, Morris reported to and was supervised by David Fite, vice president for academic affairs.

In July and August 2009, Fite became aware of allegations that Salyer had engaged in misconduct. Salyer denied the allegations. On August 28, Fite sent a letter to Salyer informing him that his contract was modified as of that date so that he would no longer serve as the director of the Johnston Center and his position as an associate professor was being reassigned to the English department. It further stated that his reassigned position would be a 10-month contract for the 2009-2010 academic year and a nine-month contract for the 2010-2011 academic year. At about that time, Salyer also learned UR apparently had begun proceedings to dismiss him for cause, although Fite later informed him those proceedings would not go forward.

On September 3, 2009, Morris informed Salyer that he would be placed on an alternative assignment for the fall 2009 semester. On October 9, Morris informed him his work responsibilities for the fall 2009 semester would be "evaluating, researching, and revising current policies of Academic Honesty." Salyer worked on academic honesty issues that semester and did not work with students.

On November 3, 2009, Salyer filed a complaint with the DFEH, alleging he was fired, demoted, harassed, denied promotion, and transferred assignments by UR because of his sex and in retaliation for reporting discrimination. On November 9, the DFEH issued a right to sue letter to him, advising him he had one year under Government Code

section 12965, subdivision (b),[1] to file a civil action under the California Fair Housing and Employment Act (FEHA). He did not file a civil action by November 9, 2010.

In December 2009, Morris advised Fite that she was considering allowing Salyer to return to working with students again on a limited basis during the spring 2010 semester as an independent study advisor to master of science students in the global information systems (GIS) program. Aware that Salyer had previously taught writing, Fite approved that assignment for him. Fite did not consider that assignment a demotion, but instead was a positive development and represented an opportunity for Salyer to demonstrate he could work again with students without further issues.

In February 2010, UR's president announced UR's budget deficit made it necessary to reduce expenses by means that included a reduction in force (RIF) of faculty. Those measures would include eliminating the positions of some nontenured and contract faculty.

On or about May 13, 2010, UR notified Salyer by letter that because of institutional need he and 11 other faculty members would not have their contracts renewed when their current contracts expired. Salyer was notified that his final date of employment with UR would therefore be May 26, 2012. Pursuant to UR's faculty handbook, UR explained its reasons for Salyer's nonreappointment, stating in part:

> "There are currently 13 faculty positions in English Literature.
> Seven faculty are tenured; five are probationary tenure track faculty

---

[1] All statutory references are to the Government Code unless otherwise specified.

4

members and one is a lecturer. Over the last six years, the department has awarded an average of 16.5 majors and 3.3 minors. There are currently 53 declared majors and 12 declared minors. In 2005, there were 10 full-time faculty members and a larger student body. While it is noted that the department plays a key role in our current Liberal Arts Foundations courses, projected reforms to our core requirements and the lack of a hearty overall demand for the major in comparison to other programs indicates that the University cannot support 13 faculty members in this program. One faculty member has recently resigned. Therefore, it is necessary to eliminate three positions."

Salyer and two other faculty members in the English department were selected for nonreappointment because they were nontenured and not teaching essential courses. The letter further requested that Salyer meet with Kathy Rodarte to schedule an appointment prior to May 21, 2010, to discuss his continuing duties of his appointment. Salyer did not respond to the request to schedule an appointment.

On June 8, 2010, Morris sent Salyer a letter requesting that he attend a meeting on June 15 or, alternatively, contact her office to schedule an alternative date. Morris stated: "It is imperative that we meet as requested." Salyer apparently responded by stating he would meet with UR administration provided he could bring his legal counsel. Salyer had previously been informed his counsel could not attend work-related meetings. Accordingly, the requested meeting apparently did not occur. Morris informed Fite she had attempted to schedule a meeting with Salyer to discuss his duties for the fall 2010 semester, but he did not meet with her despite repeated requests.

On September 3, 2010, Fite decided to pay Salyer his contract salary in lieu of service because of his lack of cooperation and failure to meet with Morris to discuss his job duties. On that date, Fite sent a letter to Salyer, stating:

> "The University has elected to pay you the balance of your compensation under your Contract in lieu of service as stated in Section 3.12.3.1 of the Faculty Handbook.
>
> "You have been unresponsive to the University with respect to discussion of possible teaching responsibilities for the upcoming academic year and other matters. This lack of cooperation has made it virtually impossible for the University to work with you for the balance of your Contract term. It is the judgment of the University that it is in the best interest of the institution as a whole to end your services and pay you full compensation under your contract.
>
> "The last day of your employment with the University is September 3, 2010.
>
> "The enclosed check has been prepared in the gross amount of $161,491.86. The check represents the amount equivalent to the amount that would have been earned by you, had you performed services under the Contract to the end of its term on May 26, 2012. A schedule has been included that shows the items that make up the total amount of the check."

On October 5, 2010, Salyer filed his second complaint with the DFEH, alleging he was fired by UR because of his sex, his reporting of discrimination, and the filing of his first DFEH complaint. On October 14, the DFEH sent him a right to sue letter, advising him he had one year under section 12965, subdivision (b), to file a civil action under FEHA.

6

On October 14, 2011, Salyer filed the instant action against UR.[2]  His original complaint apparently alleged causes of action for sex discrimination in violation of FEHA, retaliation for engaging in protected activity under FEHA, and intentional infliction of emotional distress (IIED).  The trial court apparently sustained without leave to amend UR's demurrer to Salyer's sex discrimination cause of action.  On February 21, 2012, Salyer filed a first amended complaint, alleging causes of action for unlawful retaliation for filing a DFEH complaint and IIED.  The court overruled UR's demurrer and motion to strike Salyer's allegations regarding acts that occurred prior to October 14, 2009, explaining those acts were irrelevant to any recovery Salyer may obtain, but nevertheless provide a history of events.

UR filed a motion for summary judgment or, in the alternative, summary adjudication of issues.  In support of its motion, it filed a separate statement of undisputed material facts and a compendium of evidence.  Salyer opposed UR's motion for summary judgment, filed a response to UR's separate statement and his own separate statement of material facts in dispute, lodged certain documents, and filed an appendix of exhibits and other evidence.  UR replied to Salyer's opposition, objected to evidence he submitted in opposition to its motion, and replied to Salyer's separate statements.

At the hearing on UR's motion for summary judgment, the trial court ruled that UR's separate statement invited a nonconforming opposing separate statement, which

---

[2]    The parties have not made Salyer's original complaint a part of the record on appeal.

7

invitation Salyer accepted, and instructed UR to prepare a revised separate statement. UR filed a revised separate statement. Salyer filed a response to UR's revised separate statement. UR filed a reply separate statement.

On May 19, 2014, the trial court issued a tentative ruling granting UR's motion for summary judgment. The court heard the parties' arguments and took the matter under submission. On June 24, the court ruled it would adopt its tentative ruling with minor additions and granted UR's motion for summary judgment. On July 16, the court signed a written order granting UR's motion for summary judgment. The court concluded there were no triable issues of material fact and Salyer's claims were not supported by the undisputed facts. Regarding Salyer's first cause of action for retaliation in violation of FEHA, the court concluded that claim was without merit because: (1) Salyer could not establish a prima facie case by showing he was subjected to an adverse employment action (AEA) because he had engaged in any protected activity under FEHA; (2) UR had legitimate, nondiscriminatory reasons for its employment action and there was no substantial evidence of retaliatory pretext; (3) UR had legitimate, nondiscriminatory reasons for its employment action and there was no substantial evidence of intentional retaliation; and (4) UR's alleged conduct was not a cause of Salyer's alleged damages. The court found that because only post-November 2009 acts were relevant to Salyer's claim for unlawful retaliation, UR's August 2009 modification of Salyer's contract

8

removing him as director of the Johnston Center and assigning him to the English department could not support his retaliation claim.[3]

On July 16, 2014, the trial court entered judgment for UR. Salyer timely filed a notice of appeal.

DISCUSSION

I

*Summary Judgment Standard of Review*

"On appeal after a motion for summary judgment has been granted, we review the record de novo, considering all the evidence set forth in the moving and opposition papers except that to which objections have been made and sustained." (*Guz v. Bechtel National, Inc.* (2000) 24 Cal.4th 317, 334 (*Guz*); see *Saelzler v. Advanced Group 400* (2001) 25 Cal.4th 763, 767.) "The purpose of the law of summary judgment is to provide courts with a mechanism to cut through the parties' pleadings in order to determine whether, despite their allegations, trial is in fact necessary to resolve their dispute." (*Aguilar v. Atlantic Richfield Co.* (2001) 25 Cal.4th 826, 843 (*Aguilar*).)

*Aguilar* clarified the standards that apply to summary judgment motions under Code of Civil Procedure section 437c. (*Aguilar*, *supra*, 25 Cal.4th at pp. 843-857.) Generally, if all the papers submitted by the parties show there is no triable issue of

_____

[3]    The court noted that in sustaining UR's demurrer to Salyer's first amended complaint, it ruled allegations of acts occurring prior to October 14, 2009, could not support his claims for retaliation and IIED.

9

material fact and the " 'moving party is entitled to a judgment as a matter of law,' " the court must grant the motion for summary judgment. (*Aguilar*, at p. 843, quoting Code Civ. Proc., § 437c, subd. (c).) Code of Civil Procedure section 437c, subdivision (p)(2), states:

> "A defendant . . . has met his or her burden of showing that a cause of action has no merit if that party has shown that one or more elements of the cause of action, even if not separately pleaded, cannot be established, or that there is a complete defense to that cause of action. Once the defendant . . . has met that burden, the burden shifts to the plaintiff . . . to show that a triable issue of one or more material facts exists as to that cause of action or a defense thereto. The plaintiff . . . may not rely upon the mere allegations or denials of its pleadings to show that a triable issue of material fact exists but, instead, shall set forth the specific facts showing that a triable issue of material fact exists as to that cause of action or a defense thereto."

*Aguilar* made the following observations:

> "First, and generally, from commencement to conclusion, the party moving for summary judgment bears the burden of persuasion that there is no triable issue of material fact and that he is entitled to judgment as a matter of law. . . . There is a triable issue of material fact if, and only if, the evidence would allow a reasonable trier of fact to find the underlying fact in favor of the party opposing the motion in accordance with the applicable standard of proof. . . .

> "Second, and generally, the party moving for summary judgment bears an initial burden of production to make a prima facie showing of the nonexistence of any triable issue of material fact; if he carries his burden of production, he causes a shift, and the opposing party is then subjected to a burden of production of his own to make a prima facie showing of the existence of a triable issue of material fact. . . . A prima facie showing is one that is sufficient to support the position of the party in question. . . .

> "Third, and generally, how the parties moving for, and opposing, summary judgment may each carry their burden of persuasion and/or

10

production depends on *which* would bear *what* burden of proof at trial. . . . [I]f a defendant moves for summary judgment against . . . a plaintiff [who would bear the burden of proof by a preponderance of the evidence at trial], [the defendant] must present evidence that would require a reasonable trier of fact *not* to find any underlying material fact more likely than not—otherwise, *he* would not be entitled to judgment *as a matter of law*, but would have to present *his* evidence to a trier of fact." (*Aguilar*, *supra*, 25 Cal.4th at pp. 850-851, fns. omitted.)

*Aguilar* stated:

"To speak broadly, all of the foregoing discussion of summary judgment law in this state, like that of its federal counterpart, may be reduced to, and justified by, a single proposition: *If a party moving for summary judgment in any action . . . would prevail at trial without submission of any issue of material fact to a trier of fact for determination, then he should prevail on summary judgment.* In such a case, . . . the 'court should grant' the motion 'and avoid a . . . trial' rendered 'useless' by nonsuit or directed verdict or similar device." (*Aguilar*, *supra*, 25 Cal.4th at p. 855, italics added.)

"[E]ven though the court may not weigh the plaintiff's evidence or inferences against the defendants' as though it were sitting as the trier of fact, it must nevertheless determine what any evidence or inference *could show or imply to a reasonable trier of fact*. . . . In so doing, it does not decide on any finding of its own, but simply decides what finding such a trier of fact could make for itself." (*Aguilar*, *supra*, 25 Cal.4th at p. 856.) "[I]f the court determines that all of the evidence presented by the plaintiff, and all of the inferences drawn therefrom, show and imply [the ultimate fact] *only as likely as* [not] *or even less likely*, it must then grant the defendants' motion for summary judgment, even apart from any evidence presented by the defendants or any inferences drawn therefrom, because a reasonable trier of fact could not find for the plaintiff. Under such

11

circumstances, the [factual] issue is not triable—that is, it may not be submitted to a trier of fact for determination in favor of either the plaintiff or the defendants, but must be taken from the trier of fact and resolved by the court itself in the defendants' favor and against the plaintiff." (*Id.* at p. 857, fn. omitted.)

"On appeal, we exercise 'an independent assessment of the correctness of the trial court's ruling, applying the same legal standard as the trial court in determining whether there are any genuine issues of material fact or whether the moving party is entitled to judgment as a matter of law.' [Citation.] 'The appellate court must examine only papers before the trial court when it considered the motion, and not documents filed later. [Citation.] Moreover, we construe the moving party's affidavits strictly, construe the opponent's affidavits liberally, and resolve doubts about the propriety of granting the motion in favor of the party opposing it.' " (*Seo v. All-Makes Overhead Doors* (2002) 97 Cal.App.4th 1193, 1201-1202.)

## II

### *FEHA Actions Generally*

Section 12940, subdivision (h), makes it an unlawful employment practice for an employer "to discharge, expel, or otherwise discriminate [e.g., retaliate] against any person because the person has opposed any practices forbidden under [FEHA] or because the person has filed a complaint, testified, or assisted in any proceeding under [FEHA]." *Yanowitz v. L'Oreal USA, Inc.* (2005) 36 Cal.4th 1028, at page 1042, stated:

> "[T]o establish a prima facie case of retaliation under the FEHA, a plaintiff must show (1) he or she engaged in a 'protected activity,' (2)

12

the employer subjected the employee to an adverse employment action, and (3) a causal link existed between the protected activity and the employer's action. [Citations.] Once an employee establishes a prima facie case, the employer is required to offer a legitimate, nonretaliatory reason for the adverse employment action. [Citation.] If the employer produces a legitimate reason for the adverse employment action, the presumption of retaliation ' " 'drops out of the picture,' " ' and the burden shifts back to the employee to prove intentional retaliation."

"In a summary judgment motion in 'an employment discrimination [or retaliation] case, the employer, as the moving party, has the initial burden to present admissible evidence showing either that one or more elements of plaintiff's prima facie case is lacking or that the adverse employment action was based upon legitimate, nondiscriminatory [or nonretaliatory] factors.' [Citations.] . . . [¶] '[I]f nondiscriminatory [or nonretaliatory], [the employer's] true reasons need not necessarily have been wise or correct. [Citations.] While the objective soundness of an employer's proffered reasons supports their credibility . . . , the ultimate issue is simply whether the employer acted with *a motive to discriminate* [or retaliate] *illegally*. Thus, "legitimate" reasons [citation] in this context are reasons that are *facially unrelated to prohibited bias*, and which, if true, would thus preclude a finding of *discrimination* [or retaliation].' " (*Serri v. Santa Clara University* (2014) 226 Cal.App.4th 830, 861 (*Serri*).)

"[A]n employer is entitled to summary judgment if, considering the employer's innocent explanation for its actions, the evidence as a whole is insufficient to permit a rational inference that the employer's actual motive was discriminatory [or retaliatory]." (*Guz, supra,* 24 Cal.4th at p. 361, fn. omitted.) "It is not sufficient for an employee to

13

make a bare prima facie showing or to simply deny the credibility of the employer's witnesses or to speculate as to discriminatory [or retaliatory] motive. [Citations.] Rather, it is incumbent upon the employee to produce 'substantial responsive evidence' demonstrating the existence of a material triable controversy as to pretext or discriminatory [or retaliatory] animus on the part of the employer." (*Serri*, *supra*, 226 Cal.App.4th at p. 862.) The employee cannot simply show the employer's decision was wrong, mistaken, or unwise, but rather must show such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could rationally find them unworthy of credence and instead infer the employer did not act for the proffered nonretaliatory reasons. (*Batarse v. Service Employees Internat. Union, Local 1000* (2012) 209 Cal.App.4th 820, 834 (*Batarse*).) Circumstantial evidence of pretense must be specific and substantial to create a triable issue on the question of whether the employer intended to retaliate. (*Ibid*.)

## III

### *Trial Court's Ruling on Pre-November 2009 Acts*

Salyer contends the trial court erred by finding the only acts by UR that were actionable and relevant to his retaliation cause of action were those that occurred *after* he filed his first DFEH complaint on November 3, 2009, and acts that occurred *before* that

14

date were irrelevant as time-barred.[4]  He asserts the continuing violations doctrine applies to make UR's acts prior to November 2009 (e.g., his August 2009 removal as director of the Johnston Center and reassignment to the English department and October 2009 academic honesty project assignment) actionable and relevant to his unlawful retaliation cause of action.

A

FEHA provides an employee generally must first timely file a complaint with DFEH and thereafter timely file a civil action for violation of its provisions and, if he or she does not timely make those filings, the alleged unlawful acts cannot provide a basis for relief under FEHA.  In *Acuna v. San Diego Gas & Electric Co.* (2013) 217 Cal.App.4th 1402 (*Acuna*), at page 1412, we stated regarding the first deadline:

> "Section 12960 provides that an employee bringing an FEHA claim must exhaust the administrative remedy by filing an administrative complaint with the DFEH within one year after the alleged unlawful action occurred.  (§ 12960, subd. (d).) . . .  'No [administrative] complaint may be filed after the expiration of one year from the date upon which the alleged unlawful practice or refusal to cooperate occurred . . . .' "

Regarding the second deadline, we stated:

---

4    Because Salyer does not substantively argue on appeal the trial court erred by concluding there were no triable issues of material fact and UR was entitled to judgment as a matter of law on his second cause of action for IIED, we need not, and do not, address whether the court erred by so concluding.  (*Reyes v. Kosha* (1998) 65 Cal.App.4th 451, 466, fn. 6.)  Likewise, because he does not substantively argue on appeal the court erred in sustaining without leave to amend UR's demurrer to his cause of action for discrimination in violation of FEHA, we need not, and do not, address whether the court erred by so ruling.  (*Ibid.*)  Salyer challenges on appeal only the court's summary adjudication of his cause of action for retaliation in violation of FEHA.

15

"Section 12965 concerns a separate statutory deadline applicable *after* the DFEH issues a right-to-sue notice. The code section provides that after an employee files a complaint and the DFEH does not issue an accusation within a specified period, the DFEH must issue a right-to-sue letter notifying the employee that he or she may bring a civil suit within one year of the date of the notice. (§ 12965, subd. (b); [citation].) This code section establishes a strict 'one-year statute of limitations, commencing from the date of the right-to-sue notice by the [DFEH],' except for certain statutory exceptions. [Citation.] Section 12965's one-year deadline from the right-to-sue notice is 'a condition on a substantive right rather than a procedural limitation period for commencement of an action.' [Citation.] Thus, it ' "cause[s] the right which previously arose and on which a suit could have been maintained, to *expire*." ' " (*Acuna*, *supra*, 217 Cal.App.4th at p. 1413.)

The section 12960 one-year period for filing the initial complaint with the DFEH may be subject to equitable tolling pursuant to the continuing violations doctrine. (*Acuna*, *supra*, 217 Cal.App.4th at p. 1412.) "[T]he continuing violations doctrine may toll the section 12960 accrual period if the employer engaged in a series of continuing and related FEHA violations and at least one of those alleged violations occurred within the one-year period." (*Ibid*.) Under that doctrine, the section 12960 limitations period "begins to accrue once an employee is on notice of the violation of his or her rights *and* on notice that 'litigation, not informal conciliation, is the only alternative for the vindication of his or her rights.' " (*Acuna,* at p. 1412.) That limitations period is therefore tolled if the employer's repeated violations were "(1) sufficiently similar in kind . . . ; (2) have occurred with reasonable frequency; (3) and have not acquired a degree of permanence." (*Richards v. CH2M Hill, Inc.* (2001) 26 Cal.4th 798, 823.) The continuing

16

violations doctrine applies to claims alleging retaliation in violation of FEHA. (*Acuna*, at p. 1413; *Yanowitz v. L'Oreal USA, Inc.*, *supra*, 36 Cal.4th at p. 1056.)

B

Salyer does not appear to, and reasonably cannot, dispute that the application of sections 12960 and 12965 in this case would bar his claims based on UR's acts *before* November 2009 *if* the continuing violations doctrine does not apply. The record shows he filed his initial complaint with the DFEH on November 3, 2009, and the DFEH issued its right to sue letter on November 9, advising him he had one year under section 12965, subdivision (b), to file a civil action under FEHA. However, he did not file a civil action by November 9, 2010. Absent application of the continuing violations doctrine or another exception to the general rule, section 12960, subdivision (d), and section 12965, subdivision (b), clearly apply to bar Salyer's claims based on UR's pre-November 2009 acts because he did not file the instant action within one year of the DFEH's right to sue letter, which was based on UR's pre-November 2009 acts. (*Acuna*, *supra*, 217 Cal.App.4th at pp. 1412-1413.)

Contrary to Salyer's assertion, the trial court correctly concluded the continuing violations doctrine did not apply to toll, or "stay," section 12960, subdivision (d)'s one-year period for filing a complaint with the DFEH. He argues that period was tolled during the internal "grievance" process instituted by UR based on misconduct allegations against him. However, as UR asserts, the continuing violations doctrine can apply when an employee files an internal grievance based on alleged wrongful acts against him or her

17

and continues to pursue that grievance in lieu of timely filing a complaint with the DFEH.

In *Acuna*, we stated:

> "Equitable tolling allows a plaintiff who has a choice of legal remedies to pursue one remedy without simultaneously pursuing another remedy.  [Citations.]  The doctrine relieves the plaintiff claiming employment discrimination from the hardship of pursuing duplicate and possibly unnecessary procedures to enforce the same rights or obtain the same relief.  [Citation.] [¶]  The equitable tolling doctrine generally requires a showing that the plaintiff is seeking an alternative remedy in an established procedural context."  (*Acuna*, *supra*, 217 Cal.App.4th at p. 1416.)

"[T]he equitable tolling doctrine is inapplicable once the employee is on notice that his or her rights had been violated and that [his or] her alternate remedies will be unsuccessful." (*Acuna*, *supra*, 217 Cal.App.4th at p. 1417.)  Alternatively stated, the section 12960 limitations period "begins to accrue once an employee is on notice of the violation of his or her rights *and* on notice that 'litigation, not informal conciliation, is the only alternative for the vindication of his or her rights.' "  (*Id*. at p. 1412.)

Applying the foregoing principles, we conclude the continuing violations doctrine cannot apply to toll the section 12960 one-year period for filing a DFEH complaint in the circumstances of this case.  First, Salyer did not file any grievance with UR related to the allegations of misconduct made *against* him.  Rather, *UR*, and not Salyer, initiated and conducted its own investigation based on allegations made by others of possible

18

misconduct by Salyer.[5]  Ultimately, that investigation was concluded without any action taken by UR against Salyer.  Second, the record does not show that any of the matters investigated by UR were based on the primary wrongful acts alleged by Salyer in this action.  Salyer's removal as director of the Johnston Center, his reassignment to the English department, and his academic honesty assignment were not the focus of UR's investigation into allegations of misconduct by Salyer, and Salyer did not pursue his claims based on those actions during that internal investigation process in lieu of filing a formal DFEH complaint or civil action.  Therefore, because Salyer was on notice of those alleged violations of his rights and on notice that litigation, and not informal conciliation, was the only alternative for the vindication of his rights, the continuing violations doctrine cannot apply to toll section 12960, subdivision (d)'s one-year period for filing a complaint with the DFEH.  (*Acuna*, *supra*, 217 Cal.App.4th at p. 1412.)

Furthermore, based on the undisputed facts in this case, there were no repeated violations by UR that were sufficiently similar in kind, occurred with reasonable frequency, and had not acquired a degree of permanence, such that the continuing violations doctrine could apply to toll the running of section 12960, subdivision (d)'s one-year filing period.  (*Richards v. CH2M Hill, Inc.*, *supra*, 26 Cal.4th at p. 823.)  When UR removed Salyer as director of the Johnston Center, reassigned him to the English

---

[5]    To the extent Salyer asserts UR's investigation into allegations of misconduct against him also included an investigation of his claims of harassment by other faculty members against him, the undisputed facts in the record do not support that assertion.

department, and assigned him to the academic honesty project, those pre-November 2009 acts acquired a degree of permanence and did not recur thereafter. Absent frequent occurrence of those acts without acquiring a degree of permanence, the continuing violations doctrine cannot apply. (*Ibid.*) *Schifando v. City of Los Angeles* (2003) 31 Cal.4th 1074 and other cases cited by Salyer are inapposite to this case and do not persuade us to reach a contrary conclusion. Therefore, the trial court correctly concluded Salyer could not rely on pre-November 2009 acts by UR as grounds for relief in his instant action.

IV

*No Evidence of Post-November 2009 Adverse Employment Action*

Salyer contends the trial court erred by concluding he did not present sufficient evidence to support a reasonable inference that UR took an adverse employment action (AEA) in retaliation against him after he filed his first DFEH complaint in November 2009. Alternatively stated, he argues the court erred by concluding there were no triable issues of material fact on the issue of whether he had established a prima facie case of retaliation by showing he was subjected to an AEA because he engaged in a protected activity under FEHA and that UR was entitled to judgment as a matter of law.

A

*Pre-November 2009 acts.* As discussed above, Salyer cannot rely on any of UR's pre-November 2009 acts as grounds for an AEA in violation of FEHA because those acts are barred by his failure to timely file a civil action under section 12965 and the

inapplicability of the continuing violations doctrine to toll section 12960's filing period pertaining to those acts. Therefore, we need not, and do not, address the question of whether any of those acts (e.g., UR's removal of Salyer as the director of the Johnston Center, his reassignment to the English department, and his assignment to work on its academic honesty policies for the fall 2009 semester) constitute AEA's.

B

*Post-November 2009 acts.* Salyer nevertheless asserts UR took actions after November 2009 that constituted AEA's in retaliation for his protected activity under FEHA. First, he asserts UR reduced his pay and benefits after November 2009. Second, in December 2009, UR assigned Salyer to work as an independent study advisor to master of science students in the GIS program for the spring 2010 semester. Third, in May 2010, UR notified Salyer that he, along with 11 other faculty members, would not have their current contracts renewed on their contracts' expiration because of UR's institutional needs (i.e., the RIF budget cutback). Subsequently, on September 3, 2010, because of Salyer's failure to cooperate and meet with Morris to discuss his continuing job duties, UR paid him the gross amount of his salary for the remaining 20 months of his current contract in lieu of further service.

*Pay and benefits.* Salyer asserts that after he filed his complaint with the DFEH on November 3, 2009, UR reduced his pay and benefits. He argues his pay was reduced from $90,000 to $84,400 and his contract was changed from 11 months per year to nine months per year. However, he does not cite to any evidence in the record that supports

21

those assertions or would create a triable issue of material fact on those issues. Rather, the undisputed evidence in the record shows he was entitled to $90,500 for the first two years of his initial three-year contract, which was effective August 1, 2007. For those first two years (i.e., Aug. 1, 2007 - Jul. 31, 2009), his annual base salary was $85,500 and he also would receive an additional $5,000 stipend, for a total of $90,500 per year. During the third year of his contract (i.e., Aug. 1, 2009 - Jul. 31, 2010), he was to receive just his base salary of $85,500 without any additional stipend. Therefore, his salary was automatically reduced under his initial contract from $90,500 to $85,500, effective August 1, 2009. That salary reduction occurred both before his November 3, 2009, DFEH complaint, and pursuant to the terms of the initial contract he signed in 2007. Accordingly, the record does not support his assertion that UR reduced his salary after and/or because of the DFEH complaint he filed on November 3, 2009. Salyer does not cite any admissible evidence in support of that assertion or otherwise show there is a triable issue of material fact on the issue of his pay and benefits.

Likewise, the record does not support his assertion UR reduced his contract from an 11-month contract to a nine-month contract after he filed his DFEH complaint on November 3, 2009. On the contrary, the undisputed evidence in the record shows that reduction occurred before November 3, 2009, and therefore cannot provide a basis for any claim of retaliation under FEHA. Salyer's initial three-year contract with UR provided that he would serve as the director of the Johnston Center and that it was a

22

"renewable 11-months per year, . . . contract, effective August 1, 2007."[6] On August 28, 2009, Fite, on behalf of UR, sent a letter to Salyer informing him that his contract was modified as of that date so that he would no longer serve as the director of the Johnston Center and his position as an associate professor was being reassigned to the English department. It further stated that his reassigned position would be a 10-month contract for the 2009-2010 academic year and a nine-month contract for the 2010-2011 academic year. Therefore, the reduction in his contract from 11 months to nine months occurred on August 28, 2009, when Fite notified him of that change in his contract. Furthermore, that change specified that it would occur in two steps (i.e., a 10-month contract for the 2009-2010 academic year and then a nine-month contract for the 2010-2011 academic year). UR did not take any action after August 28, 2009, to reduce his months of service under his contract. Because that change in his contract occurred before his November 3, 2009, DFEH complaint, the record does not support his assertion that UR reduced the months of his contract from 11 months to nine months after and/or because of the DFEH complaint he filed on November 3, 2009.

Salyer does not cite any evidence supporting a reasonable inference that UR took any action after November 3, 2009, to reduce his months of service under his contract or

---

[6] To the extent Salyer asserts he had a six-year contract, he does not support that assertion with a citation to any evidence in the record. On the contrary, the record shows his initial contract had a three-year term (i.e., from Aug. 1, 2007 - Jul. 31, 2010) and apparently was thereafter renewed for an additional two academic years (i.e., through May 26, 2012). Therefore, Salyer had, at most, a total contract term of five, not six, years.

otherwise showing there is a triable issue of material fact on the issue of a reduction of his months of service under his contract after he filed his DFEH complaint. Likewise, to the extent he argues that change in the contract resulted in a reduction in his salary, he does not cite any evidence showing the reduction in the months of service under his contract that purportedly resulted in a reduction in his salary occurred as a result of a change in his contract after he filed his DFEH complaint on November 3, 2009.[7] Salyer has not carried his burden on appeal to show the trial court erred by concluding there were no triable issues of material fact on the issue of whether UR reduced his salary and benefits and/or months of service under his contract after he filed his DFEH complaint on November 3, 2009.

*Spring 2010 reassignment*. Salyer also argues his reassignment by UR to tutoring students in its GIS program for the spring 2010 semester was an AEA in retaliation for his filing of his DFEH complaint on November 3, 2009. The undisputed evidence in the record shows that Salyer was reassigned to the English department on August 28, 2009, and on October 9, he was informed he was to work on UR's academic honesty policies for the fall 2009 semester. Salyer worked on UR's academic honesty policies that semester and did not work with students. In December 2009, UR reassigned Salyer to

_____

[7]     Fite's August 28, 2009, letter to Salyer informed him of the change in his contract from a 11-month contract to a 10-month contract for the 2009-2010 academic year, with a salary of $81,386, and then to a nine-month contract for the 2010-2011 academic year (but without specifying the exact salary).

work with students again during the spring 2010 semester as an independent study advisor to master of science students in the GIS program.

Salyer asserts he was demoted by UR in retaliation for his filing his DFEH complaint on November 3, 2009. He argues he was the director of the Johnston Center before he filed his complaint and was demoted to the GIS tutoring position shortly after he filed his DFEH complaint. However, by so arguing, he overlooks the intermediate reassignment that occurred between his removal as the director of the Johnston Center and his reassignment to the GIS tutoring position. After he was removed on August 28, 2009, as the director of the Johnston Center, he was immediately reassigned to the English department and on October 9 he was directed to work on UR's academic honesty policies for the fall 2009 semester. Therefore, prior to his DFEH complaint on November 3, 2009, Salyer was assigned to the English department and worked on UR's academic honesty policies. After he filed his DFEH complaint, he was reassigned in December 2009 to the GIS tutoring position for the spring 2010 semester and was able to work with students again. Based on the undisputed evidence in the record, it cannot reasonably be inferred that a reassignment from working on UR's academic honesty policies without student contact for the fall 2009 semester to tutoring GIS students for the spring 2010 semester was a demotion. In his declaration, Fite stated he did not consider that reassignment a demotion, but instead was a positive development and represented an opportunity for Salyer to demonstrate he could work again with students without further issues. Salyer does not cite any evidence that could reasonably support a contrary

25

inference. The trial court correctly concluded there were no triable issues of material fact on the issue of Salyer's reassignment to the GIS tutoring position for the spring 2010 semester and that his reassignment by UR was not a demotion or AEA based on the undisputed facts. That reassignment cannot reasonably be considered a material adverse change in the terms or conditions of his employment. (*Thomas v. Department of Corrections* (2000) 77 Cal.App.4th 507, 511 [more disruption than alteration of job duties is required for AEA]; *Yanowitz v. L'Oreal USA, Inc.*, *supra*, 36 Cal.4th at pp. 1054-1055 ["[m]inor or relatively trivial adverse actions . . . that, from an objective perspective, are reasonably likely to do no more than anger or upset an employee cannot properly be viewed as materially affecting the terms, conditions, or privileges of employment"].) *Patten v. Grant Joint Union High School Dist.* (2005) 134 Cal.App.4th 1378 and other cases cited by Salyer are inapposite to this case and do not persuade us to reach a contrary conclusion.

*Termination on September 3, 2010.* In May 2010, UR notified Salyer and 11 other faculty members that their contracts would not be renewed when their current contracts expired because of institutional need. Salyer was notified that his final date of employment with UR would be May 26, 2012. However, on September 3, 2010, Fite, on behalf of UR, paid Salyer his contract salary in lieu of service and terminated his employment with UR because of his lack of cooperation and failure to meet with Morris to discuss his job duties. The trial court implicitly concluded Salyer's job termination was not an AEA because he was fully compensated for the remaining 20 months of his

26

contract in lieu of service. UR's faculty handbook provides that UR may pay a faculty member compensation in lieu of service after nonreappointment. Although on appeal Salyer argues UR's termination of his employment is an AEA and he therefore made a prima facie case of retaliation, he does not cite sufficient evidence or analogous cases showing there are triable issues of material fact on the issue of whether his termination on payment in full under his contract in lieu of service was an AEA. Therefore, he has not carried his burden on appeal to show the court erred by concluding his job termination was not an AEA based on the undisputed facts and therefore he could not make a prima facie case of retaliation by UR. (Cf. *Wynn v. Paragon Systems, Inc.* (S.D. Ga. 2004) 301 F.Supp.2d 1343, 1354 [payment of wages that would have been earned through end of employment is not an AEA].)

V

*Legitimate Nonretaliatory Reasons*

Salyer contends the trial court also erred by concluding he did not present sufficient evidence to support a reasonable inference that UR's proffered legitimate, nonretaliatory reasons for its acts were a mere pretext for retaliation against him. Although he does not appear to dispute that UR presented sufficient evidence of legitimate, nonretaliatory reasons for its acts, he argues he presented sufficient responsive evidence showing there are triable issues of material on the issue of whether UR's reasons were pretext for unlawful retaliation. He argues he was incorrectly included by UR as part of the English department in its 2010 RIF decision because he, in fact, was originally

27

part of the Johnson Center and in 2010 was working as a tutor in the GIS program, which was not in the English department. He also argues UR's RIF was a pretext for retaliation because evidence shows UR was not operating at a deficit when it decided in 2010 to not renew his contract and the contracts of 11 other faculty members.

Assuming arguendo there are triable issues of material fact on the issues of whether Salyer's September 2010 termination was an AEA and whether he made a prima facie case of retaliation based on the AEA, we nevertheless conclude the trial court correctly concluded UR met its burden to present evidence showing legitimate, nonretaliatory reasons for its termination of Salyer's employment, and Salyer did not meet his burden to present sufficient responsive evidence showing there was a triable issue of material fact on the issue of whether UR's reasons were a pretext for unlawful retaliation; therefore, UR was entitled to judgment as a matter of law. In support of its motion for summary judgment, UR presented evidence showing it needed to reduce its budget by not renewing the contracts of certain faculty members when those contracts expired. In his February 23, 2010, memorandum to the UR community, Stuart Dorsey, UR's president, stated UR had a $13 million structural budget deficit that required cost reductions, including an RIF of faculty members. Toward that cost-reduction effort, Fite chose to not renew the contracts of 12 nontenured faculty members, including Salyer. Fite selected three English department faculty members, including Salyer, for nonrenewal of their contracts because they were not tenured and did not teach essential courses. Also, three English department positions were chosen for contract nonrenewal because

28

there was relatively less demand by students who majored in English compared to students who majored in other areas. Furthermore, with 13 faculty members, the English department was relatively overstaffed compared to its 10 faculty members in 2005 when UR had a larger student body. Therefore, UR's structural budget deficit was a legitimate, nonretaliatory reason for its decision to not renew the contracts of Salyer and 11 other faculty members. (Cf. *Martin v. Lockheed Missiles & Space Co.* (1994) 29 Cal.App.4th 1718, 1732 [depressed condition of employer's business was good cause to discharge employee and supports inferences of good faith and absence of improper motive in discharge decision]; *Guz*, *supra*, 24 Cal.4th at pp. 358-360.)

Salyer cites certain evidence that he argues shows UR's proffered legitimate, nonretaliatory reasons for his contract nonrenewal were a pretext for retaliation. He notes Morris denied during her deposition that UR's budget was a factor in deciding which individuals would be part of the RIF. However, her denial did not contradict statements by Dorsey and Fite that UR had a structural budget deficit that required reduction in operating costs, including the nonrenewal of contracts for certain nontenured faculty members. Alternatively stated, Morris's deposition testimony does not support a reasonable inference that Salyer was chosen for nonrenewal of his contract for retaliatory reasons rather than for UR's proffered reason of reducing its operational costs by not renewing the contracts of 12 faculty members. Salyer also notes Fite stated in his deposition that UR was "able to pay its bills but was concerned about the actions it had to take and would have to take in the foreseeable future . . . in order to make budget every

29

year." Contrary to Salyer's apparent assertion, the fact that UR was able to pay its bills at the time of the nonrenewal of the contracts of Salyer and 11 other faculty members does not support a reasonable inference Salyer was chosen for nonrenewal of his contract for retaliatory reasons rather than for UR's proffered reason of reducing its operational costs by not renewing the contracts of 12 faculty members. Finally, the fact that UR subsequently (in September 2012) hired an administrator to teach a writing course that Salyer was competent to teach does not support a reasonable inference that UR's actions in early 2010 were a pretext for retaliation and not for its proffered reason of reducing its operating costs. Salyer did not present sufficient evidence supporting a reasonable inference that UR's proffered legitimate, nonretaliatory reasons for not renewing his contract were pretext for unlawful retaliation.

Salyer also argues that because he was not part of the English department he should not have been included in the English department positions selected for contract nonrenewal and therefore the nonrenewal of his contract based on that reason was a pretext for unlawful retaliation. However, as discussed above, UR reassigned Salyer from the Johnston Center to the English department on August 28, 2009. Although he did not thereafter teach courses offered by the English department, he nevertheless remained part of the English department when UR directed him to work on UR's academic honesty policies for the fall 2009 semester and later directed him to tutor students in the GIS program. Morris stated in her deposition that "[i]t was not uncommon for faculty to teach outside their home departments on courses." She stated

30

Salyer taught advanced composition to GIS students during the spring 2010 semester. Furthermore, at the time of UR's decision not to renew Salyer's contract, Fite and Morris understood he had been reassigned to the English department. (*King v. United Parcel Service, Inc.* (2007) 152 Cal.App.4th 426, 436 ["It is the employer's honest belief in the stated reasons [for an employment action] and not the objective truth or falsity of the underlying facts that is at issue in a [retaliation] case."].) In any event, 12 faculty members were selected from different departments for contract nonrenewal and Salyer was included because he was not tenured and did not teach essential courses. Salyer does not cite any responsive evidence supporting a reasonable inference that Fite, Morris, or any other UR administrator involved in the RIF decision did not believe he was part of the English department or that, in any event, he would not have been included in the RIF for legitimate, nonretaliatory reasons had he been part of another department at that time.

UR also presented evidence that it had legitimate, nonretaliatory reasons to ultimately terminate Salyer's employment in September 2010 by its payment of his full contract compensation in lieu of service for the remaining 20 months of his contract. Despite repeated requests by Morris, his supervisor, to meet with her regarding his work duties for the fall 2010 semester, he did not do so. Based on that conduct, Fite decided to pay Salyer his contract compensation in lieu of service as permitted by the faculty handbook. Salyer's argument that UR would not allow him to meet with Morris together with his attorney does not refute UR's stated position that his attorney was not allowed to attend work-related meetings with him and does not otherwise support a reasonable

31

inference that his employment was terminated based on unlawful retaliation rather than UR's proffered legitimate, nonretaliatory reasons. To the extent Salyer argues UR's decision to not renew his contract and/or its ultimate decision to terminate his employment by paying him his full contract compensation in lieu of service was wrong, mistaken, or unwise, that is not sufficient to rebut UR's proffered legitimate, nonretaliatory reasons and support a reasonable inference that UR's reasons were a pretext for unlawful retaliation. (*Batarse*, *supra*, 209 Cal.App.4th at p. 834.) Rather, Salyer must demonstrate such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in UR's proffered legitimate reasons for its action that a reasonable factfinder could rationally find them unworthy of credence and infer UR did not act for those reasons but instead for unlawful retaliation. (*Ibid*.; *McRae v. Department of Corrections & Rehabilitation* (2006) 142 Cal.App.4th 377, 388; *Morgan v. Regents of University of California* (2000) 88 Cal.App.4th 52, 75.)

In opposing UR's motion for summary judgment, Salyer did not meet his burden to present sufficient responsive evidence to support a reasonable inference that it was more likely UR had a motive of unlawful retaliation than a legitimate, nonretaliatory reason for its post-November 3, 2009 acts. (*Serri*, *supra*, 226 Cal.App.4th at p. 862; *Cucuzza v. City of Santa Clara* (2002) 104 Cal.App.4th 1031, 1038.) His speculation regarding UR's purported unlawful motive does not constitute substantial responsive evidence. (*Cucuzza*, at p. 1038.) We conclude the trial court correctly concluded there

32

were no triable issues of material fact and UR was entitled as a matter of law to summary adjudication on Salyer's cause of action for unlawful retaliation.[8]

## VI

### *Evidence of Allegations Against Salyer*

Salyer contends the trial court erred by considering evidence of allegations of misconduct made against him in its determination of UR's motion for summary judgment. He notes the trial court's June 24, 2014, order adopting its tentative ruling on UR's motion for summary judgment refers to allegations of misconduct against him made in spring 2009.[9] He further notes Fite and Morris testified at their depositions that he was not terminated for any alleged misconduct and Fite ultimately had informed him no action for dismissal for adequate cause would be taken. Salyer argues that any weight or consideration the court gave to the evidence of the allegations of misconduct against him in support of his termination was prejudicial error because those charges against him were ultimately dismissed. In response, UR notes it explained to the trial court that its

---

[8]    As we stated above, because Salyer does not contend on appeal the trial court erred by also granting summary adjudication for UR on his IIED cause of action, we need not, and do not, decide whether the court erred by so ruling.

[9]    That order stated: "In the Spring of 2009, [Salyer] had been accused of inappropriate behavior with students, including providing alcohol to underage students at his home and in restaurants, making inappropriate comments to students about personal drug use and sexual activity, and inappropriate touching." That same statement was included in the trial court's July 16, 2014, order granting UR's motion for summary judgment.

references in its moving papers to the allegations of misconduct against Salyer were merely background information relating to its pre-November 2009 acts.

Regardless of whether any of the allegations of misconduct against Salyer were true based on his admissions or otherwise, the record shows the trial court considered those allegations merely as background information and did not consider that evidence substantively in deciding UR's motion for summary judgment. In its order granting UR's motion, the court noted Fite ultimately notified Salyer no action would be taken against him based on those allegations. In so doing, the court implicitly gave no weight or other consideration to those allegations. Contrary to Salyer's assertion, we conclude the court's reference to those allegations in its order and/or consideration of those allegations as background information was not prejudicial error.

VII

*Payment in Lieu of Services*

Salyer contends the trial court erred by concluding UR paid all compensation due him when on September 3, 2010, it paid him his contract compensation in lieu of service for the remaining 20 months of his contract. Although he concedes UR paid him all contract compensation due to him for the period of September 3, 2010, through May 26, 2012, he apparently argues he was entitled to an additional year of compensation beyond that period. He cites language in his contract that states: "You will have the option to be reviewed for tenure during your fourth year, academic year 2010-2011. If you choose not to be reviewed for promotion and tenure at these times you will be reviewed during your

34

sixth year, academic year 2012-2013." He further cites his declaration in opposition to UR's motion for summary judgment in which he states UR's faculty handbook provides that the probationary period for tenure-track faculty members is six years, unless that period is reduced by contract to no less than four years. Although Salyer does not expressly so argue, he apparently takes the position that language in his contract and the faculty handbook entitled him to employment through May 26, 2013, and therefore UR should have paid him compensation for an additional year.

We conclude Salyer has not carried his burden on appeal to present evidence supporting a reasonable inference that he was contractually entitled to compensation through May 26, 2013. As discussed above, his initial contract had a three-year term and not a six-year term as Salyer apparently asserts. Any provisions in his contract and the faculty handbook referring to probationary periods for tenure did not alter or extend that initial three-year contract term or UR's two-year contract renewal thereafter. Those provisions cited by Salyer can only reasonably be interpreted as providing for a probationary period for a nontenured faculty member that applies only so long as he or she is employed by UR. Contrary to his apparent assertion, those provisions do not support a reasonable inference that a faculty member's contract has a six-year term, especially when the express language of that contract provides for a definite, lesser term (e.g., three years). Salyer has not carried his burden to show the court erred by concluding UR paid him all compensation due under his contract.

35

VIII

*UR's Response to Salyer's Separate Statement of Disputed Facts*

Salyer contends the trial court erred by not deeming as true the 104 disputed facts asserted in his separate statement of disputed facts, none of which UR specifically disputed.

In support of its motion for summary judgment, UR filed a separate statement of undisputed material facts. In opposition to its motion, Salyer filed a response to UR's separate statement and also filed a separate statement of material facts in dispute. The latter document consisted of 50 pages and set forth 104 material facts that purportedly were in dispute on his unlawful retaliation cause of action. UR responded to Salyer's separate statement by filing a reply that addressed each of the 104 purported disputed facts by explaining how each purported disputed fact was irrelevant, immaterial, and/or unsupported by the evidence. However, UR did not expressly "dispute" Salyer's allegations that those facts were disputed.

Contrary to Salyer's assertion, the trial court was not required to accept as true all of the material facts that he alleged in his separate statement were disputed. Salyer does not cite any rule or case that requires a party moving for summary judgment to respond to a separate statement of disputed facts filed by an opposing party by either agreeing or disputing those purported disputed facts. Rules of Court, rule 3.1350(f),[10] cited by

---

10    Rules of Court, rule 3.1350(f), provides: "(1) Each material fact claimed by the moving party to be undisputed must be set out verbatim on the left side of the page,

36

Salyer, applies only to separate statements filed by moving parties and sets forth actions required to be taken by opposing parties. That rule does *not* apply to separate statements filed by parties opposing a motion for summary judgment. The court did not err by not accepting as true all 104 facts in Salyer's separate statement that he alleged were disputed based on UR's failure to either agree with or dispute those disputed facts.

DISPOSITION

The judgment is affirmed. UR is entitled to costs on appeal.

McDONALD, Acting P. J.

WE CONCUR:

IRION, J.

Prager, J.*

---

below which must be set out the evidence said by the moving party to establish that fact, complete with the moving party's reference to exhibits. [¶] (2) On the right side of the page, directly opposite the recitation of the moving party's statement of material facts and supporting evidence, the response must unequivocally state whether that fact is 'disputed' or 'undisputed.' An opposing party who contends that a fact is disputed must state, on the right side of the page directly opposite the fact in dispute, the nature of the dispute and describe the evidence that supports the position that the fact is controverted. Citation to the evidence in support of the position that a fact is controverted must include reference to the exhibit, title, page, and line numbers."

*       Judge of the San Diego Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.